628 F.2d 448
 J. and R. DOE, as Guardian Ad Litem for I. Doe, et al.,
Plaintiffs-Appellees,
v.
James PLYLER, Superintendent of the Tyler Independent School
District and its Board of Trustees, et al.,
Defendants-Appellants,
and
State of Texas, Intervenor-Appellant.
 No. 78-3311.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 20, 1980.
Rehearing Denied Nov. 17, 1980.
 
 John C. Hardy, Tyler, Tex., for Tyler.
 Richard L. Arnett, Susan J. Dasher, Asst. Attys. Gen., State of Texas, Austin, Tex., for State of Texas.
 Antonio Guajardo, Kelly Frels, Timothy T. Cooper, Houston, Tex., for Houston Independent School Dist., amici curiae.
 Hurst Hannum, Washington, D.C., for Intern. Human Rights Law Group.
 Peter D. Roos, Linda Hanten, San Francisco, Cal., Larry R. Daves, Tyler, Tex., Vilma S. Martinez, San Francisco, Cal., for Mexican-American Legal Defense.
 Drews S. Days, III, Asst. Atty. Gen., Mark Gross, Brian Landsberg, Jessica Silver, Appellate Section, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., for amicus curiae.
 Robert J. Kenney, Jr., Sara-Ann Determan, Paul S. Ryerson, Carol A. Cichowski, Washington, D.C., Antonio Guajardo, Houston, Tex., for Nat. Ed. Ass'n, et al.
 Appeals from the United States District Court for the Eastern District of Texas.
 Before DYER, FRANK M. JOHNSON, Jr., and POLITZ, Circuit Judges.
 FRANK M. JOHNSON, Jr., Circuit Judge:
 
 
 1
 Through Section 21.031 of the Texas Education Code, the State of Texas commands the free public education of its children. The State, however, extends that command only to those children legally within its borders.[1] Texas has declined to provide financial aid for the education of alien children who are unable to document the legality of their presence.[2] The Tyler Independent School District (TISD) implemented the policy of Section 21.031 by charging a tuition of $1000 per year for each undocumented child as a prerequisite to enrollment in the Tyler public schools.
 
 
 2
 A group of undocumented children, represented by their parents, initiated the present litigation against TISD challenging the constitutionality of the statute and the TISD tuition policy. The State of Texas intervened as a party defendant.[3] The United States District Court for the Eastern District of Texas issued a preliminary injunction and ordered that the suit be maintained as a class action.[4] Following a trial on the merits, the district court held that Section 21.031 and the TISD tuition policy violated the equal protection clause of the Fourteenth Amendment, Doe v. Plyler, 458 F.Supp. 569, 585 (E.D.Tex.1978), and, alternatively, that the policy and statute infringed upon an area pre-empted by federal law[5], id. at 592. We affirm the district court in its holding that the application of Section 21.031 to undocumented alien children is a violation of the equal protection clause. We do not agree with the conclusion of the district court that the policy and statute infringe upon an area pre-empted by federal law.
 
 
 3
 Section 21.031 was enacted as a response to the complex problems caused by the influx of illegal immigrants into the United States. The hope of obtaining jobs, coupled with the unwillingness or inability of the federal government to enforce its immigration laws, has enticed thousands of young Mexicans[6] to leave their native country and illegally enter the United States. It is undisputed that, compared to United States citizens as a whole, illegal aliens constitute a disadvantaged group. But bad as their living and working environment is in the United States, it is apparently better than what they would experience in Mexico; thus these aliens continue to illegally cross the border. Because they are within this country illegally, they often do not receive the benevolent protections of the law, for they know that to invoke government protection would subject them to possible identification and deportation to their native country. Hence, the rights of these illegal aliens and the corresponding responsibilities of the states toward them have not been litigated to an appreciable degree.
 
 
 4
 In Texas, as well as other border states, the illegal immigration of aliens is a hotly debated, many-faceted political and economic issue.[7] A large part of the controversy surrounding illegal immigrants springs from the resentment that the federal government is not enforcing its immigration laws and the fears that the aliens illegally residing in the United States will depress local labor markets or drain states' social programs. These fears, some of which are grounded in fact, serve as the basis for statutes such as Section 21.031.
 
 
 5
 Just as the illegal immigration problem is itself fraught with emotions, so too is the means Texas has chosen to deal with its illegal immigration problem. Because denying a person a basic education is tantamount to ensuring that the person remains at the lowest socio-economic level of modern society, the operation of Section 21.031 yields particularly harsh results.[8] Juxtaposed against the model of equality of opportunity toward which the United States government is dedicated, these harsh results give rise to strong emotional feelings. It is with this background in mind that we address the legal issues in this case.
 
 I. PRE-EMPTION
 
 6
 The district court applied the tests enunciated by the Supreme Court in De Canas v. Bica, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), to determine whether the Texas statute impermissibly interfered with federal law and was thus pre-empted by the supremacy clause of the Constitution.[9] We agree that the De Canas standards govern the present case; however, in applying those standards, we reach a conclusion contrary to that of the district court.
 
 
 7
 The Supreme Court in De Canas reviewed a California statute that subjects to criminal as well as civil penalties employers who knowingly employ aliens "not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers." Cal.Lab Code § 2805(a) (West Supp.1980). Recognizing that the power to regulate immigration unquestionably rests exclusively in the federal government, the Court stated that not "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power. . . ." De Canas, supra, 424 U.S. at 355, 96 S.Ct. at 936. The Court therefore concluded that the California statute had not invaded the federal sphere of immigration regulation.
 
 
 8
 The Supreme Court then inquired whether the statute regulated a field that Congress alone occupies and was thus invalid under the supremacy clause. The Court observed that such a determination should be reached only if " 'the nature of the regulated subject matter permits no other conclusion, or (if) the Congress has unmistakably so ordained.' " Id. at 356, 96 S.Ct. at 937 (quoting Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)). Examining the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U.S.C.A. § 1101 et seq., the Court determined that the INA is mainly concerned with "the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." De Canas, supra, 424 U.S. at 359, 96 S.Ct. at 938. The Court ascertained congressional concern over the employment of illegal aliens to be, at most, peripheral. On the other hand, regulation of employment falls under the traditionally broad police power of the states. Finding no clear intent of Congress to "preclude even harmonious state regulation touching on aliens in general, or the employment of illegal aliens in particular," id. at 358, 96 S.Ct. at 938, the Court ruled that California was not congressionally ousted from regulating the employment of illegal aliens.
 
 
 9
 Granting the existence of room for state regulation, the Court opined that the statute must fall if it obstructs " 'the accomplishment and execution of the full purposes and objectives of Congress . . ..' " Id. at 363, 96 S.Ct. at 940 (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1971); Florida Lime and Avocado Growers, supra, 373 U.S. at 141, 83 S.Ct. at 1216). The Court remanded on this issue to allow the state court to determine whether the statutory phrase "entitled to lawful residence" would be interpreted consistent with federal law.
 
 
 10
 The De Canas case clearly teaches that Section 21.031 of the Texas Education Code may be invalidated on pre-emption grounds only if, first, Congress has clearly and manifestly evidenced an intent to occupy the field of education of illegal aliens or, second, if Section 21.031 is an obstacle to the achievement of a congressional purpose. The district court did not address the former criteria, but found that the latter criteria mandated invalidation of the statute. Plaintiffs do not ask that we consider the federal occupation issue, but urge us to accept the finding of the district court that Section 21.031 is an obstacle to the achievement of federal legislative purposes and is thus pre-empted. After reviewing the relevant federal policy, we conclude that the perceived conflicts are at most illusory and that Section 21.031 does not conflict with federal policy.[10]
 
 
 11
 The district court perceived a conflict to arise between the federal policy of apprehending illegal aliens at the border or at their places of employment and the state policy of treating illegal aliens as second-class citizens. But the federal government also denies illegal aliens federal largess, 7 U.S.C.A. § 2015(f) (excluding illegal aliens from participation in the food stamp program); 42 U.S.C.A. § 1382c(a)(1)(B) (excluding illegal aliens from supplemental security income for the aged, blind, and disabled); Aid to Families with Dependent Children, 45 C.F.R. § 233.50 (1979) (excluding illegal aliens); Medicaid, 45 C.F.R. § 248.50 (1976) (to be recompiled at 42 C.F.R. § 448.50) (excluding illegal aliens); see also 5 C.F.R. § 7.4 (1980) (excluding all aliens from most federal jobs), and we think it not inconsistent with that federal policy for Texas to likewise deny illegal aliens its largess.[11]
 
 
 12
 Citing the Elementary and Secondary Education Act and Amendments, 20 U.S.C.A. § 2701, et seq. (West Supp.1980), and the Protocol of Buenos Aires, 21 U.S.T. 607 (amending the charter of the Organization of American States, 2 U.S.T. 2394) the district court also concluded that Section 21.031 conflicts with a strong federal commitment to education, specifically the education of disadvantaged children.[12] The federal statute relied on by the district court, however, is merely a funding provision that establishes prerequisites for the receipt of federal aid. See (1965) U.S.Code Cong. & Admin.News at 31. Even if Section 21.031 serves to disqualify Texas from the receipt of federal aid, a question on which we express no opinion, the statute certainly does not require the states to provide a free public education to children whose presence in this country is illegal. Likewise, the Protocol of Buenos Aires, supra, 21 U.S.T. 607, 671, which has never been considered self-executing, recognizes the desirability of providing education to all children, but does not indicate a clear commitment to educating children illegally in the country.[13]
 
 
 13
 Plaintiffs essentially argue that since the federal government has repeatedly indicated its desire to extend quality education to all children, and specifically to disadvantaged children, but has never excluded undocumented children from its educational programs, Congress intended any program that denies undocumented children access to free basic education to be pre-empted. Plaintiffs' position is plausible, though not persuasive. Indeed, Congress may have intended to ensure a free education to all children within the United States. But we find no evidence that this was the express or implied[14] intent of Congress, and in the absence of such an intent we are " 'enjoin(ed from) seeking our conflicts between state and federal regulation where none clearly exists.' " Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 130, 98 S.Ct. 2207, 2216, 57 L.Ed.2d 91 (1978) (quoting Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 45, 86 S.Ct. 1254, 1260, 16 L.Ed.2d 336 (1966); Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 446, 80 S.Ct. 813, 817, 4 L.Ed.2d 852 (1960).
 
 II. EQUAL PROTECTION
 A. The Scope of the Equal Protection Clause
 
 14
 No state shall . . . deprive any person of life, liberty, or property, without due process of law nor deny to any person within its jurisdiction the equal protection of the laws.
 
 
 15
 U.S.Const. Amend. XIV. It is undisputed that the Fourteenth Amendment due process protections extend to aliens, even if they are in the United States illegally. Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). Similarly, aliens legally residing in the United States are entitled to the equal protection of the laws as guaranteed by the Fourteenth Amendment. E. g., Ambach v. Norwick, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979); Wong Wing v. United States, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Whether aliens illegally residing in the United States are entitled to equal protection of the laws, however, has never been squarely addressed by the Supreme Court. For the reasons stated below, we conclude that all aliens-even those illegally within the territorial boundaries of the United States-are entitled to the equal protection of the laws.[15]
 
 
 16
 By its terms the Fourteenth Amendment prohibits the states from denying equal protection of the laws to "any person within its jurisdiction." We think that aliens illegally within this country are clearly persons within the jurisdiction of the state in which they reside and thus fall under the simple language of the Fourteenth Amendment. The defendants argue that an alien illegally within the territorial boundaries of the United States is not a person within the jurisdiction of the state. In support of this contention appellants cite Leng May Ma v. Barber, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958), a case in which an alien who was not admitted to, but was paroled within, the physical boundaries of the United States was held not to be "within the United States" under the provision of the Immigration and Nationality Act she sought to invoke.[16] As noted by the Leng May Ma Court, the question presented was "wholly one of statutory construction." Id. at 187, 78 S.Ct. at 1073. Furthermore, the decision in Leng May Ma turned on presence within the United States; jurisdiction of the United States or of any state was not in issue. We therefore find Leng May Ma inapplicable to the present situation.
 
 
 17
 While the Supreme Court has never explicitly addressed whether the equal protection clause extends to illegal aliens, the Court in Wong Wing, supra, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140, indicated that the Fourteenth Amendment does afford illegal aliens the equal protection of the laws. In Wong Wing the Court stated:
 
 
 18
 (I)n the case of Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220, it was said: "The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any state deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the law.' Those provisions are universal in their application to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or nationality; and the equal protection of the laws is a pledge of the protection of equal laws." Applying this reasoning to the Fifth and Sixth Amendments, it must be concluded that all persons within the territory of the United States are entitled to the protection guaranteed by those amendments, . . . .
 
 
 19
 Id. at 238, 16 S.Ct. at 981 (emphasis added).
 
 
 20
 Finally, the logic of the Fourteenth Amendment counsels that illegal aliens were intended to be afforded equal protection of the laws. Observing that Texas is not bound to provide an education for aliens residing in their native countries, the defendants argue that it is illogical to require the states to grant educational benefits to aliens illegally within the United States solely because the aliens violated the federal immigration laws and entered the country illegally. This contention, however, fails to acknowledge the jurisdictional predicate of the equal protection clause. In light of this predicate, and in light of the settled recognition of due process rights attaching upon mere illegal entry into the country,[17] we find no merit to this argument.[18] The defendants also urge that it is illogical to allow the federal government to deny benefits of its social programs to illegal aliens, see Mathews v. Diaz, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), and then to disallow the states from similarly denying the benefits of their programs. But the federal government may withhold benefits from legal aliens, id., when at the same time the states must afford legal aliens equal protection of the laws, e. g., Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). The illogic perceived by defendants is nothing more than a failure to recognize that the denial of federal benefits rests on the power of the federal government to regulate immigration a power that was not reserved to the states.[19]
 
 
 21
 Defendants have advanced no plausible argument suggesting that the equal protection clause does not extend to aliens illegally within the country, and we are similarly unable to formulate any such argument. Indeed, when we consider the ultimate results that would obtain if illegal aliens were not afforded the equal protection of the laws,[20] we are convinced that the Fourteenth Amendment means what it says: All persons within the jurisdiction of a state are entitled to the equal protection of the laws of that state.
 
 B. The Applicable Standard of Review
 
 22
 Having determined that the states are constitutionally bound to afford equal protection of the laws to illegal aliens, we now consider the appropriate standard to be applied in reviewing Section 21.031 of the Texas Education Code. If this challenged law threatens a fundamental right or impacts upon a suspect class, we must strictly scrutinize the law and uphold it only if it is precisely tailored to further a compelling government interest. E. g., Shapiro v. Thompson, 394 U.S. 618, 638, 89 S.Ct. 1322, 1333, 22 L.Ed.2d 600 (1969). On the other hand, if Section 21.031 does not threaten a fundamental right or impact on a suspect class, we must uphold it if it bears some rational relationship to a legitimate government objective.[21] We briefly address the parties' arguments.
 
 
 23
 Plaintiffs initially contend that strict scrutiny is appropriate because the effective total exclusion from free basic education by Section 21.031 is a denial of a fundamental interest, namely, education. We recognize that education has yet to be classified as a fundamental interest sufficient to invoke strict scrutiny under the equal protection clause; but neither this Court nor the Supreme Court has ever been faced with a statute absolutely barring some resident children from all access to free public education. Indeed, although the Supreme Court in San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), indicated that relative deprivation of educational benefits does not violate equal protection, the Court expressly left unanswered the question whether an absolute bar to free educational benefits would be constitutional. Id. at 25 n.60, 93 S.Ct. at 1292 n.60. However much we are impressed with the importance of basic education to a child's development,[22] we find no solid constitutional precedent for determining that some kind of access to basic education is a fundamental interest sufficient to invoke strict scrutiny. Nevertheless, in light of the Court's Rodriguez opinion, we decline to find that complete denial of free education to some children is not a denial of a fundamental right.
 
 
 24
 Plaintiffs next assert that a heightened standard of review is appropriate because the undocumented children are being punished for the acts of their parents, acts for which they bear no responsibility. Conversely, defendants urge that the illegal alien children are being placed in the excluded classification solely because of their own illegal status. While defendants correctly state the differentiations contained in the statute, they ignore the realities underlying the plaintiff children's status as illegal aliens. The plaintiffs undeniably stand in violation of federal law, but certainly they have committed no moral wrong. As children they are under the actual and legal control of their parents.[23] To suggest that plaintiffs are being excluded from education for their own illegal actions places form over substance.
 
 
 25
 Finally, the plaintiffs contend that strict scrutiny is the appropriate standard of review because the legislation impacts on a suspect class, namely, aliens. In support of this argument, the plaintiffs cite numerous cases in which the Supreme Court has held lawfully admitted aliens to be a suspect class. See Nyquist v. Mauclet, 432 U.S. 1, 9, 97 S.Ct. 2120, 2125, 53 L.Ed.2d 63 (1977); Examining Board of Engineers v. Flores de Otero, 426 U.S. 572, 601-02, 96 S.Ct. 2264, 2280-2281, 49 L.Ed.2d 65 (1976); In re Griffiths, 413 U.S. 717, 721, 93 S.Ct. 2851, 2854, 37 L.Ed.2d 910 (1973); Sugarman v. Dougall, 413 U.S. 634, 642, 93 S.Ct. 2842, 2847, 37 L.Ed.2d 853 (1973); Graham v. Richardson, supra, 403 U.S. at 372, 91 S.Ct. at 1852. Cf. Ambach, supra, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (applying governmental function exception to strict scrutiny and upholding state statute disallowing aliens to work as public school teachers); Foley v. Connelie, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (applying governmental function exception to strict scrutiny review and upholding state statute disallowing aliens to work as police officers); Perkins v. Smith, 370 F.Supp. 134 (D.Md.1974) (three-judge panel), aff'd mem., 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1976) (applying governmental function exception and upholding state statute excluding aliens from jury duty). But this is not a case of the Texas Legislature drawing lines on the basis of mere alienage; if it was, strict scrutiny would clearly be the correct test. Nyquist v. Mauclet, 432 U.S. at 7-9, 97 S.Ct. at 2124-2125. Rather, the State of Texas has differentiated between, on one hand, school-age citizens and lawful aliens residing in Texas and, on the other hand, anyone else, including but not limited to aliens illegally residing in Texas.[24] We find no basis to conclude that a statute treating all legal aliens similarly is per se subject to strict judicial scrutiny.[25]
 
 
 26
 Of course, the characteristics of the group of illegal aliens excluded from benefits under Section 21.031 may be such that suspect status is proper. As stated by the Supreme Court in Rodriguez, supra, 411 U.S. at 28, 93 S.Ct. at 1294, suspect status is accorded those groups that are "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." Defendants do not seem to controvert that plaintiffs fall into the above definition; instead, they suggest that the plaintiff children are, by virtue of their violation of the federal immigration laws, deserving of state-imposed disabilities, purposeful unequal treatment, and political powerlessness. Plaintiffs' violation of federal immigration laws may constitutionally give rise to disabilities and unequal treatment imposed by the federal government. See Mathews, supra, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478. Moreover, we recognize that plaintiffs' status as aliens may constitutionally support their exclusion from the governing functions of the states. Ambach, supra, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49; Foley, supra, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287. But we have ascertained no legal precedent for determining that the commission of a federal misdemeanor[26] may in and of itself serve as the legitimate basis for state-imposed disabilities.
 
 
 27
 For any of the above reasons or for a combination of the above reasons,[27] this statutory classification may be deserving of strict judicial scrutiny. But we need not dwell on that difficult decision, for we find that Section 21.031 is constitutionally infirm regardless of whether it is tested using the mere rational basis standard or some more stringent test.
 
 C. The Statute Reviewed
 
 28
 The defendants rely on various arguments to justify the constitutionality of Section 21.031. First and foremost, the defendants assert that the State may use its limited amount of funds available for education to protect the rights of citizens and those who are legally admitted.[28] The right sought to be protected by the State is the access of legal aliens and citizens to what the defendants term adequate free education. We point out that while the absolute denial of education might well be a denial of a constitutionally protected right, no Supreme Court authority squarely holds to that effect. Furthermore, if illegal aliens are granted free education, legal aliens and citizens will not be absolutely deprived of a free education. At most, the quality of education they receive will decline, and a mere decline in the quality of education that falls equally on the entire population does not give rise to a claim of constitutional dimension. See Rodriguez, supra, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16. Hence, what the defendants refer to as a right can best be described as a state-provided bounty to which citizens and legal aliens become entitled solely because of the equal protection clause of the Fourteenth Amendment.[29] Regardless of terminology, the basic thrust of the defendants' position is the same: Texas concluded that, in order to protect the education of documented children, it must decrease or avoid increasing the total cost of education; to accomplish this result Texas excluded undocumented children from its free public schools.
 
 
 29
 Citing Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the defendants suggest that because the cost of a government program is at issue, this Court should defer to the legislative judgment of what is wise economic policy. But our inquiry is not whether Texas made a wise decision; our inquiry is confined to the narrow limits of whether Texas made a choice consistent with the Constitution. Moreover, we agree that courts should be hesitant to interfere with legislative decisions concerning the financing of governmental programs. It is not within the expertise of this Court to decide the wisest way to handle the complex problems of financing a public school system. Put more accurately, it is not the function of this Court, or any other court, to make such decisions. But we are not at liberty to ignore a violation of the Constitution merely because a state clothes its actions in economic phraseology.
 
 
 30
 Texas strongly urges that decreasing its costs is a rational justification for Section 21.031.[30] To accept this contention would mean that cost, in and of itself, could justify the exclusion of any group of people from any government program that requires funding. This is clearly not the case. United States Department of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (applying rational basis test); see e. g., Graham v. Richardson, supra, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (strict scrutiny test); Shapiro v. Thompson, supra, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (compelling state interest). We think it clear that a state's desire to save money cannot be the basis of the total exclusion from public schools of a group of persons who are entitled to the equal protection of the laws of Texas and who share similar characteristics with included children.
 
 
 31
 Texas insists that the saving point of its argument is that the excluded children do not share the characteristic of legality of presence with included children.[31] This would be a point well taken but for the fact that the undocumented children fall within the ambit of the equal protection clause. In light of the application of the equal protection clause, however, Texas may not justify its discrimination by a mere desire to discriminate.
 
 
 32
 Texas next attempts to justify Section 21.031 by asserting that any decrease in the quality of education for citizens and legal aliens would not be offset by a significant gain.[32] This is so, argues Texas, because current immigration department practice is to concentrate on deporting illegal aliens who hold the highest paying jobs. Since a well-educated illegal alien is expected to earn more than an illegal alien totally deprived of any formal education, the well-educated illegal alien is more likely to be deported. Thus, Texas concludes, the State would not realize any significant gain by educating illegal aliens. But we find no basis for assuming that Texas seeks, or even constitutionally could seek, to confine the long-term benefits of the education it provides to either its border or the national border. Furthermore, if Texas did intend this end, it chose a grossly underinclusive means.
 
 
 33
 Another justification for Section 21.031 is asserted to rest on the fear that illegal aliens will contaminate citizen and legal alien children with communicable diseases-diseases that have been curtailed by immunization programs in the United States. The record does not reflect any evidence tending to prove that illegal aliens are more afflicted with these diseases than the general population. Assuming for the sake of analysis that illegal aliens are more afflicted with communicable diseases, we note that Texas apparently recognizes the more traditional means of accomplishing the containment of these diseases, for it states that schools may routinely require health certificates from students.[33] Nevertheless, Texas argues that even if schools require health certificates, illegal alien parents may pass communicable diseases through their children. By Texas' own admission, it is not merely the undocumented children's health that concerns the State, but their possible contact with other illegal aliens, such as their parents. We believe it clear that some citizen children who are eligible to attend Texas schools live with their illegal alien parents. Furthermore, because illegal aliens tend to reside near other Spanish-speaking residents, many eligible children reside nearby and have close contact with illegal aliens. Finally, even if Texas is concerned with the health of the undocumented students, there is no reason to believe that undocumented students in the Tyler Independent School District who can afford to pay tuition are less afflicted with communicable diseases than other undocumented students. We therefore conclude that if Texas seeks by the statute in question to control the health of the children attending its schools, it has done so in an irrational way.
 
 
 34
 The final justification tendered on this appeal is that denying undocumented children an education will lessen the incentive for aliens to illegally enter the United States and, specifically, the State of Texas. This goal, which is entirely consistent with federal immigration policy, may be commendable; however, the Constitution at a minimum requires that the means used by Texas be rationally related to that goal. We observe that the number of illegal aliens who bring their children to the United States is a small percentage of the total number of aliens illegally residing in the United States. Hence, Section 21.031 is aimed at only a small part of the total illegal immigration problem. We also note that Texas has declined to enact the measure most likely to result in lessening the incentive to illegally enter the United States, namely, a statute that would prohibit employers from employing illegal aliens. Of course, Texas is in no way obligated to enact this measure. Indeed, a state is not required to "choose between attacking every aspect of a problem or not attacking a problem at all." Dandridge v. Williams, 397 U.S. 471, 486, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970); Williamson v. Lee Optical, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). But the failure of Texas to enact the measure most likely to achieve its stated goal casts serious doubt on its exclusionary motive. This doubt, coupled with the district court's finding that Section 21.031 is an ineffectual means of discouraging illegal immigration, leads us to conclude that the statute is not rationally related to its asserted goal.
 
 
 35
 The defendants have interspersed various other justifications throughout their briefs. We also find them to be without merit.[34]
 
 
 36
 This Court is acutely aware that Texas is suffering the local effects of a national problem. When national immigration laws are not or cannot be enforced, it is the states, most particularly the border states, that bear the heaviest burden. This Court can readily understand the problems faced by a state such as Texas. However, this Court cannot suspend the operation of the Constitution to aid a state to solve its political and social problems.
 
 
 37
 We accordingly AFFIRM the district court's order enjoining defendants from applying Section 21.031 of the Texas Education Code and the tuition policy adopted by the Tyler Independent School District so as to deny free public education to any child in the Tyler Independent School District on the basis of his or her status as an undocumented Mexican alien.
 
 
 
 [1]
 Tex.Educ.Code § 21.031 provides in part:
 (b) Every child in this state who is a citizen of the United States or a legally admitted alien and who is over the age of five years and not over the age of 21 years on the first day of September of the year in which admission is sought shall be permitted to attend the public free schools of the district in which he resides or in which his parent, guardian, or the person having lawful control of him resides at the time he applies for admission.
 (c) The board of trustees of any public free school district of this state shall admit into the public free schools of the district free of tuition all persons who are either citizens of the United States or legally admitted aliens and who are over five and not over 21 years of age at the beginning of the scholastic year if such person or his parent, guardian or person having lawful control resides within the school district.
 
 
 [2]
 Tex.Educ.Code § 21.031(a) provides:
 (a) All children who are citizens of the United States or legally admitted aliens and who are over the age of five years and under the age of 21 years on the first day of September of any scholastic year shall be entitled to the benefits of the Available School Fund for that year.
 
 
 [3]
 The United States Department of Justice was granted leave to participate in the trial on the merits as an amicus curiae. The Justice Department contended in its post-trial brief that Section 21.031 and the TISD tuition policy are not pre-empted by federal legislation but are invalid under the equal protection clause of the Fourteenth Amendment. On appeal the Justice Department also addressed only the equal protection issue
 
 
 [4]
 The class encompassed all undocumented school-age children of Mexican origin residing within the boundaries of the Tyler Independent School District
 
 
 [5]
 The United States District Court for the Southern District of Texas in In re Alien Children Education Litigation, 49 U.S.L.W. 2088 (S.D. Tex. July 21, 1980) recently confronted a state-wide challenge to Section 21.031 of the Texas Education Code. That court found Section 21.031 to be violative of equal protection guarantees and accordingly enjoined the State of Texas from denying free public education to any child due to the child's immigration status. Upon motion by the State a panel of the Fifth Circuit stayed the injunction without opinion. Justice Powell, Circuit Justice for the Fifth Circuit, subsequently vacated the stay. Certain Named and Unnamed Noncitizen Children and Their Parents v. Texas, --- U.S. ----, 101 S.Ct. 12, 65 L.Ed.2d 1151 (1980). In his opinion, Justice Powell cautioned that interim decisions of the Court of Appeals should be disturbed only upon the weightiest considerations, and that "there must be a significant possibility that a majority of the Court eventually will agree with the District Court's decision." Id. at ----, 101 S.Ct. at 14. Noting that the case presents a difficult question of constitutional significance, Justice Powell characterized the case as one for which there is a reasonable probability that the Supreme Court will eventually grant certiorari or note probable jurisdiction. After briefly surveying the applicable cases bearing on the merits, Justice Powell wrote:
 Although the question is close, it is not unreasonable to believe that five members of the Court may agree with the decision of the District Court. . . . (This vacation) recognizes that the (district) Court's decision is reasoned, that it presents novel and important issues, and is supported by considerations that may be persuasive to the Court of Appeals or to this Court. Further, it may be possible to accept the District Court's decision without fully embracing the full sweep of its analysis.
 Id. at ----, 101 S.Ct. at 15 (emphasis added).
 
 
 [6]
 Mexican nationals are not the sole target of Section 21.031, which includes all aliens whose presence in the United States is not legal. The vast majority of the excluded class, however, are Mexican nationals, and plaintiffs represent the class of school-age Mexicans excluded from free public schools by Section 21.031
 
 
 [7]
 Depending upon political viewpoint, illegal immigration can be described as either desirable or undesirable. Illegal aliens can generally be hired to work for substandard wages under substandard conditions, which results in significant savings to their employers. If these savings are passed on to consumers, many people realize small economic gains. On the other hand, the humanistic goals sought by labor reforms in the United States are circumvented. Moreover, illegal aliens displace legal residents from potential employment, a fact not of small significance in times of unemployment. Finally, because illegal aliens working in the United States are often supporting a family in Mexico, the money sent to Mexico contributes to an imbalance of payments between the two countries. See Preliminary Report of the Domestic Council Committee on Illegal Aliens, Dec. 1976; see generally Nafziger, A Policy Framework for Regulating the Flow of Undocumented Mexican Aliens into the United States, 2 Immig. & Nat'lty L. Rev. 177 (1978)
 
 
 [8]
 Expert testimony was presented that "the exclusion of a child from education locks the child into a life of poverty. Very frequently the unavailability of upward mobility leads to frustration. In some cases it leads even to socially undesirable behavior." Record of Trial Proceedings at 128-29. Furthermore, the consequences of educational deprivation are more severe for a poor child of Mexican descent living in Texas than for a child from an affluent, nonminority family because the poor Mexican child is less likely to have family members in a position to help him secure employment. Id. One of the defendants' witnesses, under questioning by the court, conceded that the plight of an uneducated, illegal alien approaches a state of serfdom. Id. at 246
 9 U.S.Const. art. VI, cl. 2 provides:
 This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
 
 
 [10]
 See Catz & Lenard, Federal Pre-emption and the "Right" of Undocumented Alien Children to a Public Education: A Partial Reply, 6 Hastings Const.L.Q. 909 (1979); Kane & Velarde-Munoz, Undocumented Aliens and the Constitution: Limitations on State Action Denying Undocumented Children Access to Public Education, 5 Hastings Const.L.Q. 461 (1978)
 
 
 [11]
 Although we find the denial of state benefits in general to be consistent with federal policy, we make no finding concerning the constitutionality of denials of state benefits. Actions that are constitutional when taken by the federal government pursuant to its power to regulate immigration may be unconstitutional if taken by a state. It goes without saying that the federal government cannot authorize, either explicitly or impliedly, the states to take unconstitutional action
 
 
 [12]
 The commitment of the federal government to education is reflected in its many programs designed to aid the states in providing education to the children within their boundaries. See generally Elementary and Secondary Education Act and Amendments, 20 U.S.C.A. § 2701 et seq. In particular, Congress has given financial assistance to the states to establish special programs for the economically disadvantaged child, 20 U.S.C.A. § 2722; programs for the migrant child, 20 U.S.C.A. § 2761; and programs for the delinquent child, 20 U.S.C.A. § 2781. Congress has not, however, excluded undocumented children from these programs. While its silence on the subject could be taken as assent to allowing undocumented children to participate and as an agreement to partially fund their participation, the mere silence of Congress does not convince us that Congress intended to mandate the admission of undocumented children to free public schools. Indeed, in establishing the Department of Education, the Congress intimated that it was concerned not with aliens, but with citizens. Setting forth its findings, Congress stated:
 The Congress finds that (1) education is fundamental to the development of individual citizens and the progress of the Nation; (2) there is a continuing need to ensure equal access for all Americans to educational opportunities of a high quality, and such educational opportunities should not be denied because of race, creed, color, national origin, or sex.
 20 U.S.C.A. § 3401 (emphasis added). But see 20 U.S.C.A. § 3402 (one of the purposes of establishing the Department of Education is "to strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual ").
 
 
 [13]
 The Protocol of Buenos Aires provides:
 The member states will exert the greatest efforts, in accordance with their constitutional processes, to ensure the effective exercise of the right of education on the following basis:
 (a) Elementary education compulsory for children of school age, shall be offered to all others who can benefit from it. When provided by the State it shall be without charge.
 21 U.S.T. 607 (emphasis added). Nothing in our decision today is meant to imply that it is beyond the power of the federal government to "ensure the effective exercise of the right to education." We only hold that Congress has not so acted.
 
 
 [14]
 "(W)hen the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less than that which is expressed." Savage v. Jones, 225 U.S. 501, 533, 32 S.Ct. 715, 726, 56 L.Ed. 1182 (1912) (emphasis added)
 
 
 [15]
 See Bolanos v. Kiley, 509 F.2d 1023 (2d Cir. 1975) (dicta that equal protection extends to illegal aliens)
 
 
 [16]
 The alien in Leng May Ma came to the United States seeking legal entry, claiming that she was a citizen. Pending determination of her claim she was held in custody for more than a year and then released on parole. She failed to establish her claim of citizenship and consequently was ordered excluded. Alleging that she would be persecuted in her native country, she then sought to invoke Section 243(h) of the Immigration and Nationality Act, which authorized the Attorney General to "withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution . . . ." 8 U.S.C. § 1253(h). Noting that the parole of aliens seeking admission is a humane device used to avoid needless confinement, the Supreme Court examined corresponding provisions of the INA and determined that Congress intended the provision of the INA to affect a paroled alien and an alien seeking admission in a similar manner. The Court found persuasive the section of the INA providing for the parole of aliens, which provided that the parole of an alien "shall not be regarded as an admission of the alien . . . (and the alien's case) shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5). Since aliens held in custody pending entrance were not within the jurisdiction of the United States within the meaning of Section 243(h), the Court refused to extend the coverage of that section to aliens paroled within, but not admitted to, the United States
 
 
 [17]
 Aliens who seek entry to the United States are not granted Fourteenth Amendment due process rights. "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." Knauff v. Shaughnessy, 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950). On the other hand, "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." Shaughnessy, supra, 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953)
 
 
 [18]
 We reject the intimation that the due process guarantee, which guards against deprivations of rights, is somehow more basic to our constitutional scheme than the equal protection guarantee, which ensures that a person will not be excluded from a government benefit when other persons with similar characteristics are included
 
 
 [19]
 ". . . Congress, as an aspect of its broad power over immigration and naturalization, enjoys rights to distinguish among aliens that are not shared by the States." Nyquist v. Mauclet, 432 U.S. 1, 7 n.8, 97 S.Ct. 2120, 2124 n.8, 53 L.Ed.2d 63 (1977)
 
 
 [20]
 For example, if illegal aliens were not afforded equal protection of the laws, what would invalidate a state statute that established the maximum penalty for theft at 10 years if committed by a citizen or legal alien, but at 50 years if committed by an illegal alien?
 
 
 [21]
 An intermediate standard of review requiring distinctions to be substantially related to legitimate state interests has been suggested in cases involving sex classifications, see, e. g., Craig v. Boren, 429 U.S. 190, 204, 97 S.Ct. 451, 460, 50 L.Ed.2d 397 (1976) and classifications drawn on the basis of illegitimacy, e. g., Lalli v. Lalli, 439 U.S. 259, 268, 99 S.Ct. 518, 524, 58 L.Ed.2d 503 (1978). See generally Gunther, The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972). It is sufficient for the analysis of the case at hand, however, to rely on the traditional two-tiered model
 
 
 [22]
 The Supreme Court has recognized that "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). The importance of education, however, does not transform what is essentially a state-provided bounty into a constitutionally guaranteed right. Rodriguez, supra, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16
 
 
 [23]
 Texas grants parents the right to have physical possession of their children and the right to establish their children's legal domicile. Tex.Fam.Code § 12.04(1) (Vernon Supp.1980). Additionally, Texas imposes on parents the duty to control their children. Id. § 12.04(2)
 
 
 [24]
 Section 21.031 excludes from free public education persons outside the State of Texas as well as undocumented residents within its jurisdiction. Since only persons within the jurisdiction of Texas are entitled to the equal protection of the laws of Texas, the excluded group residing outside the State cannot claim a Fourteenth Amendment right to attend Texas schools. Thus, the only group within the statutory age limitations able to raise an equal protection challenge is the group of illegal alien residents
 
 
 [25]
 In Nyquist, supra, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63, the Supreme Court reviewed a New York statute that denied state benefits to resident aliens who refused to indicate their intent to become United States citizens. New York contended that strict scrutiny was inapplicable because the statute drew distinctions only within the class of aliens and was thus not based on alienage. The court handily rejected this contention, saying that "(t)he important points are that (the New York statute) is directed at aliens and that only aliens are harmed by it. The fact that the statute is not an absolute bar does not mean that it does not discriminate against the class." Id. at 9, 97 S.Ct. at 2125 (footnote omitted). Since the Texas statute is directed at and only harms aliens, it appears at first glance that strict scrutiny is mandated by the Nyquist rationale. But a careful study of the cases from which the alienage suspect status developed demonstrates that the suspect status was granted to the class of legal aliens. See Nyquist, supra, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63; Examining Board of Engineers, supra, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65; In re Griffiths, supra, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910; Sugarman, supra, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853. Therefore, although a statute that discriminates against some, but not all, legal aliens on the basis of some characteristic of alienage is subject to strict scrutiny, a statute that discriminates in favor of all legal aliens is not per se subject to judicial review
 
 
 [26]
 Illegal entry into the United States is a misdemeanor for the first commission, punishable by imprisonment of not more than 6 months duration and/or a fine of not more than $500. 8 U.S.C. § 1325
 
 
 [27]
 The district court suggested that strict scrutiny might be applicable in cases in which a "state acts independently of the federal exclusionary purposes, accepts the presence of illegal aliens, and then subjects them to discriminatory laws." 458 F.Supp. at 583. We have no need to resort to this novel approach, which would require detailed factual determinations and which could render similar statutes void in Texas but valid in other states
 
 
 [28]
 Brief for Appellant Tyler Independent School District at 35
 
 
 [29]
 If the Texas statute allowed illegal aliens to attend school free of charge, we have no doubt that a citizen's challenge based on the relative deprivation of education would have no merit
 
 
 [30]
 The parties hotly debated whether excluding illegal aliens would increase the quality of education available to citizens and legal aliens. The district court found that since state funds are allocated on the basis of average daily attendance within each district, a decrease in enrollment would diminish the amount of funds received by a district. Because many of the costs of education are fixed rather than variable, the district court reasoned that a school district may be forced to increase the funding received from local sources or cut back on its programs. The Court therefore concluded that excluding undocumented children from public schools would not necessarily improve the quality of education received by citizens and legal aliens. We find no reason to disturb the district court's finding of fact, but we also see no reason to base our decision on it. Our decision today would be no different if Texas could conclusively prove that excluding undocumented children from its schools raised the quality of education available to citizens and legal aliens
 
 
 [31]
 The State's use of a federal classification does not automatically validate Section 21.031. A state may incorporate a federal classification into its own laws; however, the state's use of the distinction must meet the appropriate equal protection standard, whether it be rational basis or strict scrutiny. E. g., Ambach, supra, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49; Oyama v. California, 332 U.S. 633, 664-64, 68 S.Ct. 269, 284-85, 92 L.Ed. 249 (1948) (Murphy, J., concurring). Hence, defendants cannot prove the rationality of Section 21.031 by merely referring to the differentiations contained in the federal immigration laws
 
 
 [32]
 Brief for Appellant Texas at 28
 
 
 [33]
 Id. at 29
 
 
 [34]
 The defendants suggest that school districts are unable to accurately estimate the number of illegal alien children who will attend their schools in the future, but no reason is given why it is more possible, if indeed it is, to accurately plan for eligible students. In any event, the defendants' lack of ability to plan for undocumented children does not justify their exclusion. The defendants also suggest that the excluded children have special educational needs that drain educational resources. But the district court found that the special needs of the undocumented children are indistinguishable from the needs of eligible students, and, moreover, that the federal government largely finances the cost of the special programs. See 458 F.Supp. at 589. Finally, the defendants intimate that illegal aliens do not pay their share of taxes, a suggestion the district court concluded to be unsupported, and thus do not deserve their share of governmental benefits. But a state may not limit a child's access to education merely because the child's parents pay relatively small amounts of income tax, or avoid some consumer taxes by giving their money to relatives outside the United States, or even actively violate the tax laws. See Shapiro, supra, 394 U.S. at 633, 89 S.Ct. at 1330 (stating that a state could not "reduce expenditures for education by barring indigent children from its schools")