JENNIFER WALKER ELROD, Circuit Judge,
concurring in part and dissenting in part:
This case is not about whether the City of Farmers Branch’s housing Ordinance is a wise policy choice. It is not for judges to make that sort of political judgment. Nor do the plaintiffs argue on appeal that the Ordinance violates their individual rights. Instead, this appeal asks the narrow question of whether federal law preempts the Ordinance.
The majority concludes that the Ordinance is preempted as an impermissible regulation of immigration and implicitly preempted via conflict preemption. In crafting its conclusion, the majority conflates the distinct doctrines of regulation *827 of immigration and conflict preemption. Because a straightforward application of Supreme Court and Fifth Circuit precedent yields a different result, I must respectfully concur in part and dissent in part. First, although the Ordinance no doubt concerns illegal immigrants, it is simply not a regulation of immigration as defined by the Supreme Court in DeCanas. Second, because the Ordinance explicitly defers to federal determinations of immigration status — similar to the statute the Supreme Court upheld last term in Whiting — it is not conflict preempted, with the exception of its separate judicial review provisions.
I. Regulation of Immigration
In DeCanas v. Bica, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), Justice Brennan wrote for a unanimous Supreme Court holding that a state statute criminalizing the employment of illegal immigrants was not preempted by federal law. Before analyzing whether Congress had preempted the statute, the Court examined whether the law was “a constitutionally proscribed regulation of immigration that Congress itself would be powerless to authorize or approve.” Id. at 356, 96 S.Ct. 933.
DeCanas began that constitutional inquiry with the principle that the “[pjower to regulate immigration is unquestionably exclusively a federal power.” Id. at 354, 96 S.Ct. 933. “But the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised.” Id. at 355, 96 S.Ct. 933. Thus, DeCanas made clear that what constitutes a “regulation of immigration” in the constitutional sense is not “the fact that aliens are the subject of a state statute.” Id. Rather, the Court narrowly defined a regulation of immigration as “essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain.” Id.
Here, the majority concedes that the Ordinance does not determine the entry or exit of anyone into or out of the United States. This should be the end of the regulation of immigration inquiry. Yet the majority finds an application of the plain language of DeCanas to be too “literal and hypertechnical” and asserts two objections to the applicability of DeCanas’s definition here.[1]
First, the majority claims the Ordinance is a regulation of immigration because it may force illegal immigrants to relocate from Farmers Branch. This theory is inconsistent with Supreme Court precedent. Just last term, the Supreme Court upheld a state law revoking the licenses of employers that knowingly employ illegal immigrants, which effectively forces aliens to relocate by depriving them of employment. Chamber of Commerce of U.S. v. Whiting, — U.S. —, 131 S.Ct. 1968, 1973, 179 L.Ed.2d 1031 (2011); see also DeCanas, 424 U.S. at 355-56, 96 S.Ct. 933 (holding a state law criminalizing the employment of illegal immigrants is not a regulation of immigration).[2] This circuit also has held *828 that a Texas statute denying free public education to children because of their status as illegal immigrants was not preempted by federal law. See Doe v. Plyler, 628 F.2d 448, 451-54 (5th Cir.1980), aff'd on other grounds sub nom. Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).[3] Certainly, just like prohibiting employment, the exclusion from free public education could effectively force illegal immigrants to relocate. Yet neither of these examples constitute a regulation of immigration under Supreme Court or Fifth Circuit precedent. Rather than following this binding precedent, however, the majority bases its analysis on a Third Circuit opinion that has been vacated by the Supreme Court. See City of Hazleton v. Lozano, — U.S. —, 131 S.Ct. 2958, 180 L.Ed.2d 243 (2011).
Second, the majority urges that the housing Ordinance is a regulation of immigration because of the underlying intent of the lawmakers to impact federal immigration law and aid in its enforcement. However, the fact that the lawmakers intended to aid the enforcement of federal immigration law does not render an ordinance a regulation of immigration. To the contrary, the Supreme Court has observed that:
Although the State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government, unchecked unlawful migration might impair the State’s economy generally, or the State’s ability to provide some important service. Despite the exclusive federal control of this Nation’s borders, we cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernable impact on traditional state concerns.
Plyler, 457 U.S. at 228 n. 23, 102 S.Ct. 2382 (emphasis added). The majority’s decision holds the exact opposite: that states have no power “to deter the influx” because any legislation with such an objective or effect would be an impermissible regulation of immigration.
Indeed, the majority broadly proclaims that “state and local laws that attempt to affect aliens will, with limited exceptions, be preempted by the national interest.” This broad statement is directly contrary to Supreme Court precedent. See, e.g., DeCanas, 424 U.S. at 355, 96 S.Ct. 933 (holding that “standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration”). It is also contrary to the facts of both DeCanas and Whiting where the state statutes not only mentioned immigration standards but predicated the penalty entirely on immigration status. Id. at 352 n. 1; Whiting, 131 S.Ct. at 1973. Tellingly, the majority’s only attempt to distinguish the Supreme Court’s guidance that local governments have the power “to deter” is that the facts in Plyler did not deal with “state regulations that directly affect the entry or removal of illegal aliens, which is what the Ordinance in this case does.” This of course begs the question whether a city’s prohibition of rental hous *829 ing directly affects entry or removal in a way that a statewide prohibition of employment or free public education does not.
Nor does the majority’s collection of sundry statements by the mayor and city attorney stating an intent to deter illegal immigration transform the Ordinance into a regulation of immigration. In fact, the legislative history to the statute in Whiting stated it was designed “to stop illegal immigration” and that state political branches acted “because it is now abundantly clear that Congress finds itself incapable of coping with the comprehensive immigration reforms our country needs.”[4] Ariz. Rev.Stat. § 23-212, Historical and Statutory Notes, Governor’s Transmittal Message (signing statement of Governor Janet Napolitano). Yet the presence of that legislative history did not affect the statute’s constitutionality.
For the above reasons, I disagree with the majority’s holding that the housing Ordinance is a “regulation of immigration.” The Ordinance concerns illegal immigrants, but to no greater extent than other laws that the Supreme Court has upheld. “Thus, absent congressional action, [the Ordinance] would not be an invalid state incursion on federal power.” DeCanas, 424 U.S. at 356, 96 S.Ct. 933.
II. Implied Preemption
Even though the housing Ordinance is not a regulation of immigration preempted independently by the Constitution, congressional action may nevertheless render the Ordinance invalid under the Supremacy Clause. Id. The majority’s opinion is unclear but appears to rest its implied preemption holding on conflict preemption, stating that the Ordinance stands as an obstacle to federal law. However, last term the Supreme Court emphasized that “[i]mplied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law.” Whiting, 131 S.Ct. at 1985 (controlling opinion of Roberts, C.J.).[5]
The majority first errs in not applying the presumption against preemption. In reaching its conclusion that the Ordinance is not entitled to the presumption because it regulates immigration, the majority asks and answers the wrong question: “because the prerogative of deciding which aliens may live in the United States belongs to the federal government, the Farmers Branch’s Ordinance does not regulate in an area historically occupied by the states, and the district court correctly declined to afford it a presumption of validity.”[6] *830 Here, the Ordinance undisputably regulates rental housing — after all, it is the denial of a rental housing license that is the basis of the complaint. Therefore, the correct question is whether the power to regulate rental housing falls within a local government’s historic powers. DeCanas illustrates that this is the correct inquiry. Even though the statute in DeCanas criminalized the employment of illegal immigrants, the Court analyzed the statute as a regulation of employment, not a regulation of immigration, and determined it would not presume that Congress “intended to oust state authority to regulate the employment relationship covered by [the INA] in a manner consistent with pertinent federal laws.” DeCanas, 424 U.S. at 357, 96 S.Ct. 933. Because the majority does not contest that state and local governments have a long history of regulating rental housing, “[f]ederal regulation ... should not be deemed preemptive of state regulatory power in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or the Congress has unmistakably so ordained.” Id. at 356, 96 S.Ct. 933 (quoting Fl. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)). The majority is simply incorrect that this strong presumption does not apply in this case.
In suggesting a conflict, the majority glosses over the Ordinance’s requirement that city officials must give absolute deference to the determinations of the federal government.
If the federal government notifies the building inspector that it is unable to conclusively verify or ascertain the immigration status of the occupant, or that the federal government’s determination of immigration status is tentative, the building inspector shall take no further action until final verification from the federal government concerning the immigration status of the occupant is received. The building inspector shall not attempt to make any independent determination of any occupant’s lawful or unlawful presence in the United States.
Farmers Branch, Tex., Ordinance 2952, § 1(D)(3). Here, Farmers Branch is powerless to make “any independent determination” of immigration status, which the Supreme Court called going “the extra mile” to avoid preemption. Whiting, 131 S.Ct. at 1981 (controlling opinion of Roberts, C.J.). In fact, the Ordinance mirrors the statutory language approved in Whiting. There, the Court emphasized that “the Arizona law expressly provides that state investigators ... ‘shall not attempt to independently make a final determination on whether an alien is authorized to work in the United States.’” Id. The Court concluded that “[a]s a result, there can by definition be no conflict between state and federal law.” Id.[7] Moreover, *831 not only does the Ordinance prohibit Farmers Branch from making any decision of immigration status, but the city officials must take no action if the federal government gives an inconclusive or even a tentative determination. See Whiting, 131 S.Ct. at 1982 (“[I]f the information provided under § 1373(c) does not confirm that an employee is an unauthorized alien, it means that the county attorney cannot satisfy his burden of proof in an enforcement action.”).
Nevertheless, I agree that the judicial review portion of the housing Ordinance goes beyond what was approved in Whiting because it allows a state court to review whether the occupant is lawfully present, while giving the federal determination “a rebuttable presumption as to the individual’s immigration status” and making conclusive only those federal determinations that “would be given preclusive effect on the question.”[8] § 1(E)(4), (E)(5). Authorizing state courts to revisit federal determinations of immigration status opens the door for conflicting state-federal rulings on an immigrant’s lawful status. This creates an obstacle to Congress setting out “the sole and exclusive procedure” for determining whether an alien may be admitted or removed from the United States. 8 U.S.C. § 1229a(a)(3). Therefore, those portions of the Ordinance are conflict preempted by federal law.[9]
III. Conclusion
Although I share the majority’s concern for the dignity of all persons, regardless of how they arrived in this great nation, the parties have only presented us the narrow legal question of whether federal law preempts Farmers Branch’s Ordinance. See Alberti v. Klevenhagen, 790 F.2d 1220, 1231 (5th Cir.1986) (Brown, J., dissenting) (“We, and the lower federal courts, are courts of limited jurisdiction. Our task is not to correct all social ills, however egregious they may seem to us as individuals. The keys to the Kingdom are not in our hands.”).
The Supreme Court and this circuit have foreclosed the reasoning of the majority opinion. Until the Supreme Court provides different marching orders, the Ordinance is neither a regulation of immigration preempted by the Constitution nor *832 (with the exception of the judicial review provisions) impliedly preempted by Congress. Accordingly, I respectfully concur that § 1(E) and § 2(E) are conflict preempted, and dissent in all other respects.

. The majority also cites to later sections of DeCanas that discussed congressional intent for state regulation in order to limit the DeCanas definition of "regulation of immigration” to instances where Congress has granted permission for state regulation. Besides being exactly backwards in terms of federalism, the majority’s suggested limitation is without textual basis as DeCanas only discussed congressional intent when discussing whether Congress implicitly preempted the law, not when deciding if it were a regulation of immigration preempted by the Constitution. See De-Canas, 424 U.S. at 361, 96 S.Ct. 933.

. Although this case deals with a city ordinance and not a state statute, no party argues *828 that the city-state distinction would make any difference to our analysis.

. In Plyler, this court held that the Texas statute was not preempted, but that it did violate the children’s equal protection rights under the Fourteenth Amendment. Plyler, 628 F.2d at 449-50. The Supreme Court subsequently affirmed this court's equal protection holding, without reaching the preemption issue. Plyler, 457 U.S. at 210 n. 8, 230, 102 S.Ct. 2382. Consequently, this court's preemption holding remains the law in this circuit. The majority opinion entirely ignores our court’s binding precedent.

. Although I generally eschew use of legislative history to determine a statute's intent, I discuss it here because of the majority’s reliance upon it.

. The implied preemption analysis received only four votes as Justice Thomas joined the rest of the opinion and concurred in the judgment. Whiting, 131 S.Ct. at 1973. Justice Thomas has previously expressed disagreement with implied preemption jurisprudence more generally. See, e.g., Wyeth v. Levine, 555 U.S. 555, 583, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (Thomas, J., concurring) ("I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court’s 'purposes and objectives’ pre-emption jurisprudence. Under this approach the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law .... [Ijmplied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution.”).

. The majority cites to United States v. Locke, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000) for the proposition that "an 'assumption’ of nonpre-emption is not triggered *830 when the State regulates in an area where there has been a history of significant federal presence.” However, the Supreme Court has more recently held that "in all pre-emption cases, and particularly in those in which Congress has legislated ... in a field which the States have traditionally occupied, ... we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.” Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (internal quotation marks omitted) (emphasis added). Any possible tension between Locke and Wyeth need not be reconciled here because it is not essential to this preemption question.

. Rather than stand as an obstacle, Farmers Branch argues that its ordinance effectuates Congress’s objectives and paves the way for enforcement of Congress’s anti-harboring statute. 8 U.S.C. § 1324(a)(1)(A)(iii); United States v. Shum, 496 F.3d 390, 391-92 (5th Cir.2007) (defining the four elements of a harboring violation as (1) an unlawfully pres *831 ent alien; (2) that the defendant conceals, harbors, or shelters; (3) while knowing or recklessly disregarding that the alien is unlawfully present; and (4) in a way that substantially facilitates the alien remaining in the United States). Local agencies may assist the enforcement of federal immigration law, Lynch v. Cannatella, 810 F.2d 1363, 1371 (5th Cir. 1987), and this circuit construes the anti-harboring provisions broadly. See United States v. Rubio-Gonzalez, 674 F.2d 1067, 1073 n. 5 (5th Cir.1982) ("Congress intended to broadly proscribe any knowing or willful conduct fairly within any of these terms that tends to substantially facilitate an alien's remaining in the United States illegally ....”). The Ordinance makes it easier to prove the anti-harboring element of a defendant’s knowledge of the alien's unlawful status, removing potential doubt when a landlord leases an apartment.

. It is true that the Arizona law in Whiting also gave the federal determination in state court proceedings only a rebuttable presumption of lawful status. Whiting, 131 S.Ct. at 1981 n. 7. It did so, however, "[ajfter specifying that a state court may consider 'only' the federal determination,” thereby making it impossible "to establish unlawful status apart from the federal determination.” Id. The Ordinance here does not similarly confine the state judicial inquiry, stating only that the court must use federal law and be bound by conclusive federal determinations having preclusive effect.

. See § 6 ("If the application of this ordinance ... is invalid, the invalidity does not affect other applications of the ordinance that can be given effect without the invalid application .... ”).