Ben Niedecken, Dallas Independent School Dist., Dallas, Tex., for defendants-appellants.

Lawrence L. Mealer, Dallas Legal Services Foundation, Inc., Alfredo Campos, Jr., Dallas, Tex., for plaintiffs-appellees.

**A. BOE, by his next friend, B. Boe et al., Plaintiffs-Appellees,**

v.

**Linus WRIGHT et al., Defendants-Appellants.**

No. 80–2017
Summary Calendar.

United States Court of Appeals, Fifth Circuit. Unit A

June 5, 1981.

Before CHARLES CLARK, REAVLEY and WILLIAMS, Circuit Judges.

PER CURIAM:

Plaintiffs-appellees are undocumented alien children who brought this class action against Dallas Independent School District (DISD) seeking to require the school district to admit them into the Dallas public schools and to provide them and all similarly undocumented alien children with a free public education. This is an appeal from an order of the district court granting plaintiffs a preliminary injunction. The court's order enjoins the school district from refusing to admit illegal alien children into the Dallas public schools pursuant to § 21.031 of the Texas Education Code [1] and the administra-

---

1. Tex.Educ.Code Ann. § 21.031 (Vernon Supp. 1980–81) provides, in pertinent part:

"(a) All children who are citizens of the United States or legally admitted aliens and who are over the age of five years and

tive regulations promulgated by DISD pursuant thereto.[2]

The district court initially denied plaintiffs' motion for preliminary injunction.[3] However, after Justice Powell's decision as Circuit Justice in *Certain Named and Unnamed Non-Citizen Children and Their Parents v. Texas*, 448 U.S. 1327, 101 S.Ct. 12, 65 L.Ed.2d 1151 (1980) (Powell, J., in chambers),[4] the district court reversed its position and granted the preliminary injunction against DISD, finding that such relief would not result in serious or irreparable injury to the school district.[5]

Because the dispositive issue involved in this case has recently been decided by this court, *see Doe v. Plyler*, 628 F.2d 448 (5th Cir. 1980), *probable jurisdiction noted,* —— U.S. ——, 101 S.Ct. 2044, 68 L.Ed. 347 (1981), the district court's order granting a preliminary injunction is affirmed.[6]

AFFIRMED.

---

under the age of 21 years on the first day of September of any scholastic year shall be entitled to the benefits of the Available School Fund for that year.

"(b) Every child in this state who is a citizen of the United States or a legally admitted alien and who is over the age of five years and not over the age of 21 years on the first day of September of the year in which admission is sought shall be permitted to attend the public free schools of the district in which he resides or in which his parent, guardian, or the person having lawful control of him resides at the time he applies for admission.

"(c) The board of trustees of any public free school district of this state shall admit into the public free schools of the district free of tuition all persons who are either citizens of the United States or legally admitted aliens and who are over five and not over 21 years of age at the beginning of the scholastic year if such person or his parent, guardian or person having lawful control resides within the school district."

2. Section 5118(a) of the Administrative Regulations of the Dallas Independent School District provides, in pertinent part:

"B. *Illegal Aliens*
Aliens residing in the DISD who cannot show proof of legal admittance to this country are not entitled to public school education. (Reference House Bill # 1126, 64th Legislature.)"

3. The district court concluded that classifications based on alienage are suspect and may require strict judicial scrutiny, but that application of strict scrutiny rests on the assumption that the aliens in question are legally within this country. In addition, the court found that Tex.Educ.Code Ann. § 21.031 and DISD Administrative Regulation § 5118(a) "are rationally related to preserving the limited resources available for public education for citizens and legally admitted aliens." The district court further determined that the public interest would both be served and disserved by admission of illegal alien children into the Dallas schools at this time.

"After balancing the four relevant factors (probability of success on the merits, irreparable injury to plaintiffs, impact on defendants, and the public interest)," the court concluded "that those factors militating against preliminary injunctive relief outweigh those favoring preliminary relief...."

4. In *Certain Named and Unnamed Non-Citizen Children*, Justice Powell vacated this court's stay of an order of the district court for the Southern District of Texas (Seals, J.) that held Tex.Educ.Code Ann. § 21.031 unconstitutional as a violation of the equal protection clause of the Fourteenth Amendment and enjoined the State of Texas from denying free public education to any child on account of his or her immigration status.

5. Justice Powell indicated that if a school "district can demonstrate that, because of the number of undocumented alien children within its jurisdiction or because of exceptionally limited resources, the operation of the injunction [enjoining all school districts in Texas from refusing to admit illegal alien children] would severely hamper the provision of education to all its students during the coming year, the granting of a stay would be justified." *Certain Named and Unnamed Non-Citizen Children*, 448 U.S. at 1334, 101 S.Ct. at 16.

6. In *Doe v. Plyler*, a panel of this court held Tex.Educ.Code Ann. § 21.031 to be violative of the equal protection clause of the Fourteenth Amendment. 628 F.2d at 458. Therefore, since this court has already held the exclusion of illegal alien children from free public education in Texas to be unconstitutional, the issue of whether the granting of preliminary injunctive relief was proper in this case vanishes. Because we are controlled by the decision in *Doe v. Plyler*, we do not review the record herein to determine whether the criteria for preliminary injunctive relief (excluding the plaintiffs' probability of succeeding on the merits) are met. If illegal aliens possess the right to a free public education equally with citizens

**434**

REAVLEY, Circuit Judge, with whom CHARLES CLARK, Circuit Judge, joins, specially concurring:

As a member of a panel of this court I am without power to "disregard the precedent set by a prior panel, even though [I conceive] error in the precedent." *Davis v. Estelle*, 529 F.2d 437, 441 (5th Cir. 1976). Absent some intervening contrary authority from the Supreme Court or this court sitting *en banc*, I am bound to follow the decision in *Doe v. Plyler*, 628 F.2d 448 (5th Cir. 1980), *probable jurisdiction noted*, ——— U.S. ———, 101 S.Ct. 2044, 68 L.Ed. 347 (1981). I can, however, write to express my disagreement with the panel's decision in *Doe v. Plyler*.

In *Doe v. Plyler*, the panel first determined that Tex.Educ.Code Ann. § 21.031 did not impermissibly conflict or interfere with federal law in the sphere of immigration regulation and, therefore, was not preempted by the supremacy clause of the constitution. 628 F.2d at 453. In considering the equal protection challenge to § 21.031, the court initially concluded that aliens illegally within the territorial boundaries of the United States are entitled to equal protection of the laws as guaranteed by the Fourteenth Amendment.[1] The court then discussed the appropriate standard of judicial scrutiny to be applied in reviewing the Texas statute to determine whether it denied illegal alien children within that State equal protection of the laws. Although

noting that Texas' statutory classification excluding illegal aliens from free public education may be deserving of strict scrutiny,[2] the panel concluded that it was not necessary to address that difficult question because it found § 21.031 to be unconstitutional under the rational basis test. 628 F.2d at 458. It is with this holding—that no rational basis exists to support the classification made by § 21.031—that I disagree.

"Under traditional equal protection analysis, a legislative classification must be sustained, if the classification itself is rationally related to a legitimate governmental interest." *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973). Under the rational basis test, a reviewing court presumes the constitutionality of the statutory discrimination. *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976) (per curiam).

In *Doe v. Plyler*, the State of Texas urged that decreasing its educational costs was a rational justification for excluding illegal aliens from the state-provided bounty of free public education. Moreover, the State also asserted that by denying illegal alien children free public education the incentive for aliens to illegally enter this country would be lessened.

In response to the State's first asserted justification, the panel concluded that "cost, *in and of itself*, could [not] justify the ex-

---

and aliens lawfully residing within Texas, then the school district cannot deny that right no matter how the interests balance.

1. *Doe v. Plyler* correctly noted that the Supreme Court has thus far only held that aliens lawfully residing in this country are entitled to equal protection and has never squarely addressed the issue of whether the equal protection clause extends to illegal aliens. 628 F.2d at 454, 458 n.25.

2. The panel suggested that a strict scrutiny test may be applicable because illegal aliens as a class might constitute a suspect classification. This is so because illegal aliens fall within the Supreme Court's definition of. groups entitled to suspect status. "[S]uspect status is accorded those groups that are 'saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to

such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Doe v. Plyler*, 628 F.2d at 458 (quoting *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973)). The panel found "no solid constitutional precedent for determining that some kind of access to basic education is a fundamental interest sufficient to invoke strict scrutiny." 628 F.2d at 457. However, in light of the Supreme Court's language in *Rodriguez* that there was no evidence therein that the Texas educational financing system operated as an absolute deprivation of free public education, the panel in *Doe v. Plyler* declined to hold that a denial of free public education to some children is not a denial of a fundamental right.

clusion of any group of people from any government program that requires funding." 628 F.2d at 459 (citing *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)) (emphasis in original). The panel's statement is too broad. Cost of a government funded program is a legitimate governmental interest. A challenged classification will be sustained if it rationally furthers such a legitimate governmental interest.[3]

*Moreno*, upon which the panel relies, stands only for the proposition that a bare legislative "desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest" and that a purpose to discriminate against an unpopular group, e. g., "hippies" or illegal aliens, "cannot, in and of itself and without reference to [some independent] considerations in the public interest," justify the challenged classification.[4] 413 U.S. at 534–35,

3. The panel in *Doe v. Plyler* also cited *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), and *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), in support of its conclusion that cost, in and of itself, cannot justify exclusion of a group from a government funded program. However, in both of these cases the Supreme Court subjected the challenged classifications to strict scrutiny as opposed to the traditional equal protection analysis of rational basis.

In *Graham*, the Court held that the states had a legitimate governmental interest in preserving the fiscal integrity of their welfare programs and that they can legitimately attempt to limit expenditures on these programs. But the Court held that the states cannot accomplish such a purpose by invidious discrimination because the challenged classifications (excluding lawfully admitted resident aliens from welfare assistance) were inherently suspect. 403 U.S. at 371–76, 91 S.Ct. at 1851–54.

In *Shapiro*, the Supreme Court applied the compelling state interest test and held unconstitutional a state classification that imposed a one-year waiting period before new residents could become eligible for public welfare assistance. The Court recognized that a state has a legitimate interest in attempting to limit its expenditures on welfare assistance, but that the state's classification was invidious because it impinged on the fundamental right of interstate travel without promoting a compelling state interest. 394 U.S. at 633, 638, 89 S.Ct. at 1330, 1333. The state in *Shapiro* had first asserted that the challenged classification was justified because it discouraged indigents from migrating to the state solely to obtain larger welfare benefits. The state also urged that the challenged classification was justified as an attempt to distinguish between newer and older residents on the basis of their contributions to the community in taxes. Although acknowledging the state's valid interest in preserving its fiscal integrity, the Court held that the first two asserted justifications were not constitutionally permissible, legitimate state objectives. 394 U.S. at 631–33, 89 S.Ct. at 1329–30. After stating that "[t]he saving of welfare costs cannot justify an otherwise invidious classification," *id.* at 633, 89 S.Ct. at 1330, the court

footnoted its decision in *Rinaldi v. Yeager*, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1963), which involved a state statute requiring prisoners who took unsuccessful appeals to reimburse the state for the cost of furnishing a trial transcript out of their institutional earnings. In *Rinaldi*, the Court indicated, it held the state statute unconstitutional as a denial of equal protection "because it did not require similar repayments from unsuccessful appellants given a suspended sentence, placed on probation, or sentenced only to a fine. There was *no rational basis* for the distinction between unsuccessful appellants who were in prison and those who were not." *Shapiro*, 394 U.S. at 633 n.11, 89 S.Ct. at 1330 n.11 (emphasis added). Therefore, it is clear that cost, in and of itself, can justify a classification if a rational basis exists for it—assuming that no constitutionally impermissible state objective exists.

In *Shapiro*, the state also asserted two governmental objectives that were not constitutionally impermissible as justifications for the challenged classification. These were administrative convenience and the prevention of fraud. 394 U.S. at 634, 89 S.Ct. at 1331. The Court concluded that even under the rational basis test the challenged classification would be unconstitutional because the state did not use and had no need to use the one-year waiting requirement for these last two governmental purposes suggested. *Id.* at 638, 89 S.Ct. at 1333.

4. In *Moreno*, the Government contended that the challenged classification (excluding households of unrelated persons from eligibility for food stamps) should be upheld—even though the little legislative history that existed suggested that Congress through the challenged classification intended to prevent so-called "hippies" from participating in the food stamp program—"as rationally related to the clearly legitimate governmental interest in minimizing fraud in the administration of the food stamp program." 413 U.S. at 535, 93 S.Ct. at 2826. The Supreme Court held that the challenged classification did not operate so as rationally to further the prevention of fraud because the practical effect of the classification was to ex-

93 S.Ct. at 2825–26 (emphasis and brackets in original).

I find that a legitimate governmental interest exists to which the denial of free public education to illegal aliens is rationally related. It is the State's interest in providing universal education, consistent with the historical policies underlying the establishment of publicly funded education in this country, while at the same time preserving its limited resources from unwarranted dilution. The major governmental policy interest behind the free public education movement in this country during the 19th century was that an enlightened electorate is necessary to maintain our democratic form of government and to preserve the liberty of the people. *See, e. g.,* T. Jefferson, Notes on Virginia, in 4 Works of Thomas Jefferson (Federal Edition 1904), pp. 60–65 (*Jefferson's explanation of his "Bill For The More General Diffusion of Knowledge"*), reprinted in S. Goldstein, Law and Public Education, pp. 4–7 (Bobbs-Merrill Co. 1974).

This policy was recognized by the Supreme Court in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In *Brown,* the Court wrote:

> "Today, education is perhaps the most important function of state and local governments. *Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities,* even service in the armed forces. *It is the very foundation of good citizenship.* Today it is a principal instrument in awakening the child to cultural

values, in preparing him for later professional training, and in helping him to adjust normally to his environment."

347 U.S. at 493, 74 S.Ct. at 691 (emphasis added). Moreover, in *Ambach v. Norwick,* 441 U.S. 68, 75, 99 S.Ct. 1589, 1594, 60 L.Ed.2d 49 (1979), the Court noted that "[t]he importance of public schools in the preparation of individuals for *participation as citizens,* and in the preservation of the values on which our society rests, long has been recognized by our decisions . . . ." (Emphasis added). In *Ambach,* the court also acknowledged that social scientists have confirmed the general perception of the public schools "as inculcating fundamental values necessary to the maintenance of a democratic political system . . . ." *Id.* at 77, 99 S.Ct. at 1595.

I conceive that the Texas Legislature, on agreeing that education is "the very foundation of good citizenship,"[5] could reasonably have concluded that it should not dilute its limited resources by providing free public education to illegal alien children, who can never—absent some form of amnesty—become citizens, exercise the franchise, or serve in the armed forces of the United States.

In *Nyquist v. Mauclet,* 432 U.S. 1, 11, 97 S.Ct. 2120, 2126, 53 L.Ed.2d 63 (1977), the Supreme Court addressed the governmental interest in the enhancement of the educational level of the electorate. There the state, as a condition for granting college tuition assistance, required students to be citizens or to have made application for citizenship or, if not qualified for citizenship, to submit a statement of intent to apply for citizenship when eligible. The Court held the statute unconstitutional un-

---

clude "from participation in the food stamp program, *not* those persons who are 'likely to abuse the program,' but rather, *only* those persons who are so desperately in need of aid that they cannot even afford to alter their living arrangements so as to retain their eligibility." 413 U.S. at 538, 93 S.Ct. at 2827 (emphasis in original). This was so because unrelated persons living together and constituting a single household under the statutory definition could alter their living arrangements so as to constitute two separate households and thus retain

their food stamp eligibility. 413 U.S. at 537, 93 S.Ct. at 1333.

5. *See* Tex.Const. art. 7, § 1, which states:

> "A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."

der the equal protection clause because the state's claimed interest in educating the electorate did not provide a justification under the *compelling state interest test*;[6] "although such education is a laudable objective, it hardly would be frustrated by including *resident aliens* [*i. e.* those lawfully residing in this country], as well as citizens, in the State's assistance programs." *Nyquist*, 432 U.S. at 11, 97 S.Ct. at 2126 (emphasis added). The implication of the Court's statement is that including illegal aliens in a state's educational assistance programs *might indeed frustrate* the state's objective of the enhancement of the educational level of the electorate.

Texas' interest in educating the electorate is clearly frustrated in this case. The record reveals that DISD has a total enrollment of 120,000 students and that the district is presently facing an enrollment of 8,700 Spanish-speaking students requiring bilingual education. DISD is already short of bilingual teachers and faces a problem of recruiting qualified bilingual teachers. With the projected enrollment of 2,000 to 5,000 illegal alien children from Mexico during the school year, the quality of education for Spanish-speaking citizens and legal resident aliens, who require bilingual education, will certainly decline.[7] I conclude that § 21.031 is rationally related to Texas' interest in educating the electorate and in avoiding a diminution of the quality of such education. Moreover, unlike the statute in *Nyquist*, the Texas statute does not discriminate against aliens legally admitted into this country. It provides free public education for citizens—who, upon attaining the age of 18, are entitled to vote—and for aliens who possess documents establishing

lawful admittance into this country—who if classified as resident aliens, are eligible to become naturalized citizens after a period of time.

With respect to the second justification advanced by the State of Texas in *Doe v. Plyler*, the panel held that the classification made by § 21.031 was not rationally related to the asserted goal of lessening the incentive for aliens to illegally enter this country. 628 F.2d at 461. The panel observed that although the asserted goal was entirely consistent with federal immigration policy, "the number of illegal aliens who bring their children to the United States is a small percentage of the total number of aliens illegally residing in the United States." *Id.* at 460–61. Therefore, the panel concluded, the challenged classification "is aimed at only a small part of the total illegal immigration problem." *Id.* at 461. Although recognizing that "a state is not required to 'choose between attacking every aspect of a problem or not attacking a problem at all,' " *id.* (citing *Dandridge v. Williams*, 397 U.S. 471, 486, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970); *Williamson v. Lee Optical*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955)), the panel reasoned that because the State failed to enact the measure most likely to lessen the incentive for aliens to illegally enter this country,[8] serious doubt was cast on the *motive* of the Texas Legislature in enacting § 21.031. "This doubt, coupled with the district court's finding that Section 21.031 is an ineffectual means of discouraging illegal immigration, [led the panel] to conclude that the statute is not rationally related to its asserted goal." 628 F.2d at 461.

6. Under the compelling state interest test, or strict scrutiny, the usual presumption of validity is not accorded to the state statute. Instead, the state "must carry a 'heavy burden of justification' "; it must demonstrate that its statute has been "structured with 'precision,' and is 'tailored' narrowly to serve legitimate objectives and that it has selected the 'less drastic means' for effectuating its objectives ...." *Rodriguez*, 411 U.S. at 16–17 (footnotes omitted).

7. In this case, an immigration official testified that less than one percent of illegal alien children speak even passable English. Hence, 99% of the estimated 2,000 to 5,000 illegal alien children residing in the Dallas Independent School District will require bilingual education.

8. It was noted that Texas had not enacted the measure most likely to result in lessening the incentive to illegally enter the country, "namely, a statute that would prohibit employers from employing illegal aliens." *Doe v. Plyler*, 628 F.2d at 461.

I disagree with the panel in *Doe v. Plyler* because it incorrectly applied the traditional equal protection analysis. Under the rational basis test, the judiciary is not concerned with the verification of a state legislature's motive for enacting a statute. The test is not whether the challenged classification is rationally related to the legislature's *motive* in enacting the statute; it is whether the classification is rationally related to a *legitimate governmental interest.* See United States Department of Agriculture v. Moreno, 413 U.S. at 534–35, 93 S.Ct. at 2825–26 (where the Court, after noting that the challenged classification was clearly irrelevant to the stated purposes of the statute and that the legislative history indicated Congress' intent to exclude "hippies" from the food stamp program, nonetheless applied the traditional equal protection analysis to the legitimate governmental interest in minimizing fraud in the program and held the classification to be wholly without any rational basis).

Under the rational basis test, the equal protection clause of the Fourteenth Amendment is violated "only if the [challenged] classification rests on grounds wholly irrelevant to the achievement of the State's objective." *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393 (1961). Moreover, "[a] statutory classification will not be set aside if *any* state of facts reasonably may be conceived to justify it." *Id.* at 426, 81 S.Ct. at 1105, *quoted in Dandridge v. Williams,* 397 U.S. at 485, 90 S.Ct. at 1161 (emphasis added).

I would hold that the Texas Legislature could reasonably find that the exclusion of illegal aliens from free public education would be a step towards lessening the incentive for aliens to illegally enter and remain in this country and in the State of Texas.[9] A state legislature is free to implement its objectives in social and economic areas [10] "step by step . . ., adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *City of New Orleans v. Dukes,* 427 U.S. at 303, 96 S.Ct. at 2517; *see also Dandridge v. Williams,* 397 U.S. at 485, 90 S.Ct. at 1161. Although the district court in *Doe* may have found the challenged classification to be an ineffectual means of eliminating the perceived evil, 628 F.2d at 461, such a finding itself, or coupled with a doubt about the legislature's motive for enacting the measure, does not lead to the conclusion that the statute is not rationally related to a legitimate governmental objective. The efficacy of legislation is not the province of the judiciary. A statute fails the rational basis test only if it rests on grounds wholly irrelevant to the achievement of a legitimate government objective. *McGowan v. Maryland,* 366 U.S. at 425, 81 S.Ct. at 1104. I cannot say that this ground on which § 21.031 rests—that is, that denying illegal aliens free public education will discourage aliens from illegally entering and residing in this country—is irrelevant to the legitimate governmental objective of lessening the incentive for illegal entry and residence in the United States.[11]

9. Evidence adduced in the hearing on plaintiffs' first motion for preliminary injunction reveals that 90% of all illegal aliens from Mexico voluntarily (*i. e.* without being caught or deported) leave the United States and return to Mexico after a period of time. Although the *Doe v. Plyler* panel observes "that the number of illegal aliens who bring their children into the United States is a small percentage of the total number of aliens illegally residing in the United States," 628 F.2d at 460–61, I find nothing irrational about Texas' desire to lessen the incentive for whole alien families to enter this country illegally since it is reasonable to assume aliens who bring their families would be less transient than most illegal aliens and

would attempt to establish permanent, albeit illegal, residences in this country.

10. *Cf. San Antonio Independent School District v. Rodriguez,* 411 U.S. at 35, 93 S.Ct. at 1297 (indicating that absent a fundamental right or suspect classification, "the undisputed importance of education will not alone cause this Court to depart from the usual standard for reviewing a State's social and economic legislation").

11. The State of Texas does have a legitimate governmental interest in lessening the incentive for aliens to illegally enter the United States—a "goal, which is entirely consistent with federal immigration policy," *Doe v. Plyler,* 628 F.2d at

The panel in *Doe v. Plyler* lays great significance on the failure of Texas to enact a statute prohibiting employers from hiring illegal aliens. Such a statute, the panel concludes, would be the measure most likely to achieve the goal of lessening the incentives for aliens to illegally enter the country. I suggest that the Texas Legislature could have concluded that it was more important to eliminate the incentive to illegal immigration in the form of the state and locally funded bounty of free public education,[12] as opposed to the incentive of employment, which is for the most part in the private sector, since the policy of affording free public education to illegal aliens would be contrary to and in conflict with national immigration policy as established by Congress. Can it be denied that free education is an incentive to move across the Rio Grande? *Cf. Graham v. Richardson*, 403 U.S. 365, 376–80, 91 S.Ct. 1848, 1854–56, 29 L.Ed.2d 534 (1971) (holding that a state's alien residency requirements for welfare benefits conflicts with federal immigration law because it discourages entry into or continued residency in the state by aliens lawfully within this country, the practical result of which is that aliens lawfully admitted under federal law are denied the privileges conferred by such admission); [13] *Sugarman v. Dougall*, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); *Truax v. Raich*, 239 U.S. 33, 42, 36 S.Ct. 7, 11, 60 L.Ed. 131 (1915) (holding that the assertion by a state of authority to deny aliens, lawfully admitted to the United States, the opportunity of earning a livelihood conflicts with federal immigration law because it "would be tantamount to the assertion of the right to deny them entrance and abode, for in ordinary cases they cannot live where they cannot work").[14] Texas could have deemed it necessary to avoid an incentive to illegal immigration that it would otherwise create by its own laws and with the public's money. This being so, it is not for this court to "sit as a superlegislature to judge the wisdom or desirability of legislative policy determina-

460; *see De Canas v. Bica*, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976)—since, as one of the border states, it bears the heaviest burden of the influx of illegal aliens into this country from Mexico. *See Doe v. Plyler*, 628 F.2d at 461. *Cf. Examining Board of Engineers, Architects and Surveyors v. Flores De Otero*, 426 U.S. 572, 605, 96 S.Ct. 2264, 2283, 49 L.Ed.2d 65 (1976) (implying that a state may control the impact and effect of federal immigration laws vis-a-vis illegal aliens by stating that "[o]nce an alien is lawfully admitted, a State may not justify the restriction of the alien's liberty on the ground that it wishes to control the impact or effect of federal immigration laws").

12. In this case there is testimony from immigration and naturalization officials that free public education for their children is a definite attraction to certain aliens who illegally enter this country with their families. In its findings of fact on plaintiffs' first motion for preliminary injunction, the district court found that it was probable that 2,000 to 5,000 undocumented alien children reside within the boundaries of the Dallas Independent School District. Although the panel in *Doe v. Plyler* omnisciently observed that the number of illegal aliens who bring their children with them into this country is a small percentage of the aliens who illegally reside here, 2,000 to 5,000 illegal alien children within DISD alone is not an insignificant number of even the estimated 675,000 illegal aliens in the entire State of Texas. *See Doe v. Plyler*, 458 F.Supp. 569, 578 (E.D.Tex.1978), *aff'd*, 628 F.2d 448 (5th Cir. 1980).

13. The Court in *Graham v. Richardson* also held alien residency requirements for welfare benefits were unconstitutional under the equal protection clause of the Fourteenth Amendment. The Court concluded that "the term 'person' [in the context of the equal protection clause] encompasses lawfully admitted resident aliens as well as citizens of the United States and entitles both citizens and aliens to the equal protection of the laws of the State in which they reside." 403 U.S. at 371, 91 S.Ct. at 1851. The Court further found that classifications based on alienage—at least to the extent they affect lawfully admitted resident aliens— "are inherently suspect and subject to close judicial scrutiny." *Id.* at 372, 91 S.Ct. at 1852.

14. The Supreme Court in *Truax v. Raich* concluded that if a state could enact laws denying aliens employment, "the practical result would be that those lawfully admitted to the country under authority of the acts of Congress, instead of enjoying in a substantial sense and in their full scope the privileges conferred by the admission, would be segregated in such of the states as chose to offer hospitality." 239 U.S. at 42, 36 S.Ct. at 11.

tions made in areas that neither affect fundamental rights nor proceed along suspect lines . . . ." *City of New Orleans v. Dukes*, 427 U.S. at 303, 96 S.Ct. at 2517 (citations omitted).

In conclusion, I cannot agree with the panel in *Doe v. Plyler* that there is no rational basis to support Tex.Educ.Code Ann. § 21.031.

The important questions for me, raised by this case and *Doe*, are whether the equal protection clause applies to aliens illegally within this country and, if so, whether they are entitled to suspect status or whether education is a fundamental right.

I may agree with the *Doe* panel that aliens illegally within the territorial boundaries of the United States are entitled to equal protection of the laws under the Fourteenth Amendment. *See* 628 F.2d at 454–56. However, I am concerned by the Supreme Court's consistent and careful language indicating that the term "person" as used in the equal protection clause of the Fourteenth Amendment "encompasses *lawfully admitted* resident aliens as well as citizens . . . ." *Graham v. Richardson*, 403 U.S. at 371, 91 S.Ct. at 1851 (emphasis added); *see In re Griffiths*, 413 U.S. at 719–20, 93 S.Ct. at 2853–54 ("a lawfully admitted resident alien is a 'person' within the meaning of the Fourteenth Amendment's directive that a State must not 'deny to any person within its jurisdiction the equal protection of the laws' "); *Takahashi v. Fish and Game Commission*, 334 U.S. 410, 420, 68 S.Ct. 1138, 1143, 92 L.Ed. 1478 (1948) ("[t]he Fourteenth Amendment . . . embod[ies] a general policy that all persons lawfully in this country shall abide 'in any

state' on an equality of legal privileges with all citizens under nondiscriminatory laws"); *Truax v. Raich*, 239 U.S. at 39, 36 S.Ct. at 9 ("[b]eing lawfully an inhabitant of Arizona, the complainant [an alien admitted to the United States under federal law] is entitled under the 14th Amendment to the equal protection of its laws"). *Cf. Foley v. Connelie*, 435 U.S. 291, 294, 98 S.Ct. 1067, 1069, 55 L.Ed2d 287 (1978) (noting that "aliens lawfully residing in this society have many rights which are accorded to noncitizens by few other countries"). *See also Certain Named and Unnamed Non-Citizen Children and Their Parents v. Texas*, 448 U.S. 1327, 1329, 101 S.Ct. 12, 14–15, 65 L.Ed.2d 1151 (1980) (Powell, J., in chambers). Therefore, it is conceivable that the Supreme Court might conclude for policy reasons [15] that an alien, who is not lawfully residing in this country, does not constitute a "person within [a state's] jurisdiction" [16] and, therefore, is not entitled to equal protection of the laws. *Cf. Leng May Ma v. Barber*, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958) (holding an alien in this country on parole, while her admissibility was being determined, was not "within the United States" for purposes of a statute that allowed the Attorney General to withhold deportation of an alien "within the United States" because in his opinion the alien would be subject to persecution in the destination country).

Whatever the eventual holding may be on whether the equal protection clause of the Fourteenth Amendment encompasses aliens unlawfully within this country; because I cannot conclude that education is a fundamental right,[17] because I do not deem to be

---

**15.** *See Burrafato v. United States Department of State*, 523 F.2d 554, 557 (2d Cir. 1975), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976), in which the court reasoned:

"If Vincenzo were 'legally' within the United States, he might well have standing in the federal courts to require the Department of State to follow its own regulations. But he is not here legally. To give him rights due to his unlawful presence greater than those he would have had if he had not come to this country, would be the worst sort of boot-

strapping and would encourage aliens to enter this country surreptitiously."

**16.** The equal protection clause provides that "nor shall any State . . . deny to *any person within its jurisdiction* the equal protection of the laws." U.S.Const. Amend. XIV (emphasis added).

**17.** In *San Antonio Independent School District v. Rodriguez*, the Supreme Court, *in discussing* whether education is a fundamental right guaranteed by the Constitution, wrote:

"suspect" a classification that discriminates against aliens illegally within this country,[18] and because I find a rational basis to support the statute, I would uphold the constitutionality of Tex.Educ.Code Ann. § 21.031.

"It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws. Thus, the key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution . . . .
"*Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected.* As we have said, the undisputed importance of education will not alone cause this Court to depart from the usual standard for reviewing a State's social and economic legislation."
411 U.S. at 34–35, 93 S.Ct. at 1297 (emphasis added); *see Ambach v. Norwick*, 441 U.S. at 77 n.7, 99 S.Ct. at 1591 n.7.
In *Doe v. Plyler*, the panel states that the Supreme Court "expressly left unanswered the question whether an absolute bar to free educational benefits would be constitutional." 628 F.2d at 456–57 (citing *Rodriguez*, 411 U.S. at 25 n.60, 93 S.Ct. at 1292 n.60). Footnote 60 of the Court's opinion in *Rodriguez* does *not* stand for the proposition that education might be a fundamental right if a statute results in a complete and absolute deprivation of public education. Rather, footnote 60 only stands for the proposition that if a statute which, by requiring payment of tuition, results in an absolute deprivation of education to those unable to pay, then a clearly defined class of "poor" people might be entitled to a greater judicial solicitude in the form of a closer scrutiny of such a statute. This case does not involve wealth discrimination. Section 21.031 classifies on the basis of being an undocumented alien, not wealth. Moreover, the DISD regulation, unlike the school district's regulation in *Doe v. Plyler*, denies illegal alien children enrollment whether or not they pay tuition.

18. Tex.Educ.Code Ann. § 21.031 does not classify on the basis of alienage. Instead, it classifies among aliens, discriminating against only those who cannot establish lawful entry into this country. Although illegal aliens as a class may possess the traditional indicia of suspectness, *see Rodriguez*, 411 U.S. at 28, 93 S.Ct. at 1293; *Doe v. Plyler*, 628 F.2d at 458, I am unwilling to extend the increased judicial solicitude that accompanies the designation of "suspect status" to a class not legally entitled to be within this country. I conclude that the application of "strict scrutiny" to statutes affecting aliens rests on the assumption that the class discriminated against is lawfully within this country. *See Foley v. Connelie*, 435 U.S. at 295, 98 S.Ct. at 1070, wherein the Court wrote:
"Following *Graham*, a series of decisions has resulted *requiring state action to meet close scrutiny to exclude aliens* as a class from educational benefits, *Nyquist v. Mauclet*, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977); eligibility for a broad range of public employment, *Sugarman v. Dougall, supra*; or the practice of licensed professions, *Examining Board v. Flores de Otero*, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973). *These exclusions struck at the noncitizens' ability to exist in the community, a position seemingly inconsistent with the congressional determination to admit the alien to permanent residence.*"
(Emphasis added).
Hence, although illegal aliens are saddled with certain disabilities and may have been subjected to a history of purposeful unequal treatment or relegated to a position of political powerlessness, *see Rodriguez*, 411 U.S. at 28, 93 S.Ct. at 1293, it is reasonable to require that, before a person can avail himself of the increased judicial solicitude that a suspect status affords under our Constitution, he must first be legally within this country.