**Simone PENA and Denise Pena, b/n/f Jesus Pena, and Jesus Pena, Plaintiffs**

v.

**BOARD OF EDUCATION OF The CITY OF ATLANTA, Carolyn Crowder, Preston W. Williams, Joseph G. Martin, Jr., Richard E. Raymer, D.F. Glover, Robert Waymer, June Cofer, Ina Evans, Carolyn D. Yancey, Individually and in their official capacity as members of the Board of Education of the City of Atlanta, Alonzo A. Crim, Individually and in his capacity as Superintendent of the Atlanta Public Schools, J. Lawrence Thompson, Individually and in his capacity as Director of Budget Management of the Atlanta Public Schools.**

Civ. A. No. C83–1787A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 25, 1985.

Sandra W. Thornton, Thornton & Rose, Tucker, Ga., for plaintiffs.

Warren C. Fortson, Bruce H. Beerman, Allie S. Edwards, Atlanta, Ga., for defendants.

## ORDER

FORRESTER, District Judge.

This action is before the court on plaintiffs' motion for summary judgment on the federal claims contained in the complaint, specifically the equal protection claim. Plaintiffs seek summary judgment as to liability only, conceding that the issue of damages is a triable issue of fact. Plain-

tiffs, in accordance with Local Rule 220–5(b)(1), have attached to the motion for summary judgment a statement of material facts which plaintiffs contend are not in dispute. Defendants, opposing the motion for summary judgment, have not attached a statement responding to plaintiffs' statement of undisputed facts, as required by Local Rule 220–5(b)(2), which provides as follows:

> The respondent to a motion for summary judgment shall attach to his response a separate and concise statement of material facts, numbered separately, to which he contends there exists a genuine issue to be tried. Response should be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in his statement shall be deemed to have been admitted.

LR 220–5(b)(2) NDGa. The court therefore deems those facts contained in the plaintiffs' statement of undisputed facts as admitted by the defendants.

For purposes of resolving the pending motion, the material undisputed facts are as follows. The plaintiff Jesus Pena is a Venezuelan citizen who, from 1978 to 1982, was admitted to this country on a F–1 visa, which authorizes admittance of a non-immigrant alien for the purpose of pursuing a degree at an institution of higher learning. The remaining plaintiffs, Simone and Denise Pena, are Jesus' children, and they were admitted to this country on F–2 visas, which are given to the spouse and minor children of holders of F–1 visas. The Pena family resided within the school district known as Home Park, which was part of the City of Atlanta School System. Simone attended Home Park Elementary School from 1978 to 1982, from kindergarten through third grade. Denise attended the same school from 1981 to 1982 for kindergarten. Until the end of the 1981 school year, Simone's attendance at the Home Park School was tuition-free.

In August of 1980, the Atlanta Public Schools distributed written procedures governing the attendance of foreign nationals in this country on certain types of visas. These procedures were developed by J. Lawrence Thompson, the Director of Budget Management for the Atlanta Public Schools. The procedures contained several classifications among the different visa categories authorized by the federal government. Specifically, holders of B, F–1, F–2, H, I, J, and L visas were required to pay tuition to attend the Atlanta Public Schools. Moreover, holders of each of those classifications were directed by the policy to change their visa status with the federal government to that of F–1. Holders of visa classifications A and G, which relate to certain international organizations, were not required to pay tuition at all. Other classifications were not dealt with by the procedures, including visa classifications C, D, E, K, M, and illegal aliens. The tuition policy applied only to those visa categories enumerated above. Thus, children of temporary residents of Atlanta who were citizens of other states, or who were children of resident aliens of this country domiciled somewhere other than the city of Atlanta, were not required to pay tuition. Prior to enactment of the August 1980 procedures, it was the policy of the city of Atlanta to charge tuition to "non-residents" of the city of Atlanta, which meant that children as to whom neither parent was a legal resident of the city of Atlanta were required to pay tuition. Exhibit 3 to Thompson Depo. The effect of the August 1980 procedures was to classify holders of B, F, H, I, J, and L visas as non-residents for purposes of the city's policies regarding tuition.

Both of the Pena girls were denied free admission to the Home Park Elementary School for the 1981 school year until their father had signed an agreement whereby he agreed to pay their tuition. Once he signed the agreement, he thereafter made approximately five tuition payments on it, in the total amount of $1,360.00, and then, on the advice of counsel, ceased payment. The city thereafter withheld the girls' report cards pending payment of the additional tuition. In September of 1982, the tui-

tion policy was rescinded, and the girls were issued their report cards. However, the tuition paid by Mr. Pena has never been refunded.

With regard to the residency classifications, the undisputed facts show that temporary sojourners in the city of Atlanta, for example the Governor of the State who would be here for a maximum period of eight years, could establish "residency," and not pay tuition. However, holders of the above-enumerated visa classifications were provided no means by which they could demonstrate that they were bona fide residents of the city of Atlanta. The most on-point hypothetical discussed by Mr. Thompson regarding the procedures whereby someone who was in Atlanta temporarily could nonetheless establish "residency" for school tuition purposes, is contained at page thirty of his deposition. Mr. Thompson testified that under the policy an individual who was a resident of the state of Alabama, who came to the city of Atlanta for a period of four years to obtain a degree, with every intention throughout that time of returning to Alabama, would nonetheless be permitted to send his children to school within the city of Atlanta tuition-free. As noted above, however, Thompson testified that someone in Mr. Pena's position, that of a person from a foreign country, holding an F–1 visa, who intended to be here for a period of no more than four years, and then return to his country, could not possibly demonstrate residence under the city's policy. Thompson Depo. at 31–32. Thus, the policy treated aliens differently from the citizens of other states.

An issue has been raised in this case with respect to the manner in which these procedures were adopted. The undisputed facts of the case demonstrate that the following occurred. The procedures were written by Mr. Thompson, and were presented to members of the finance committee of the School Board as an informational item. The majority of the Board members were present at the time, and following that meeting, Thompson understood the procedures to have been approved by the finance committee, which was, "in essence, the board." Thompson Depo., pp. 33–37. Mr. Thompson wrote a letter to the foreign student advisers at area universities within the city of Atlanta in which he represented the procedures as having been approved by the Board of Education. Moreover, Thompson testified that the meaning of that letter was that the Board of Education had given "verbal approval" of the procedures in question. Thompson Depo., pp. 37–38. The foregoing was all prior to the time that the policy was implemented. Thereafter, when Mr. Pena consulted his counsel, she sent a letter to Alonzo Crim, the Superintendent of the Atlanta Public Schools, on November 25, 1981, in which she stated the policy, her belief that it was unconstitutional, and discussed many of the precedents the court discusses below. A copy of that letter was given to counsel for the Board. Thornton Affidavit, Exhibit A. Finally, each individual Board member was sent a similar letter from Mr. Pena's counsel on June 16, 1982, while the policy was still in force and being applied against the Pena girls, reiterating that the policy appeared to be unconstitutional. No counter-evidence has been brought forward by the defendant which would permit this court to conclude that an inference could be drawn that the Board either did not approve of the program, or that Mr. Crim, Mr. Thompson, and the individual Board members, did not know of the nature of the policy. See Fed.R.Civ.P. 56(e). The only evidence of record establishes as undisputed that prior to the time the policy was revoked, each of the named defendants had notice that the policy existed, and appeared to be unconstitutional. Nevertheless, no Board member voiced opposition to the policy; indeed, it was Thompson's testimony that in his opinion the Board had verbally approved the policy before it was ever implemented.

The remaining undisputed facts deal with the rationales put forward behind the policy. In response to an interrogatory from plaintiffs as to the Board's reasons for adopting the policy, the Board responded

that it could offer no reason which would be "relevant" to this litigation. The interrogatory to the Board read as follows: "What were the reasons for excluding from the public schools children who held B, F, H, I, J and L visas unless tuition was paid for their instruction?" The response of the Board of Education and the Board of Education members reads as follows: "Defendants object to plaintiffs' interrogatory number five on the ground that same seeks information which is not relevant to the subject matter involved in the pending action nor is said information reasonably calculated to lead to the discovery of admissible evidence." Plaintiffs seek this court to draw an inference that the Board therefore proffered no rationale for the policy. However, despite the apparent inadequacy of this objection, no motion to compel which complied with the Local Rules of this court was ever filed by the plaintiffs. That being the case, the court will not draw any inferences from this interrogatory answer, but notes that the record is therefore silent as to whether there is any evidence as to why the Board adopted this policy, since no evidence was produced in opposition to the motion for summary judgment.

Mr. Thompson, on the other hand, provided several reasons behind adoption of the policy. First, Thompson testified that the policy was enacted for fiscal reasons, such that persons who did not pay taxes to the city of Atlanta would not be able to take advantage of free public education. Thompson admitted, however, that holders of the visa classifications which were subject to the tuition charge were not exempt from payment of property taxes. On the other hand, holders of A and G visas, who were *not* subject to the tuition policy, *are* exempt from payment of taxes. In a related fiscal concern, Thompson testified that it was his view that it was more difficult to educate foreign students, because their lack of command of English made it more expensive. The third reason proffered by Mr. Thompson for the procedure was to make the city's policy regarding non-immigrant aliens conform to that of other metropolitan Atlanta school systems. Fourth,

Thompson testified that, in his opinion, children who held those visas other than F–1 violated their federal visa status by going to school, and therefore they should be required to obtain F–1 visas in order to attend school.

The fifth reason proffered by Mr. Thompson is reprinted from his deposition verbatim below:

Q: ... [W]hy did you go to the trouble of setting up this policy, examining visa categories, requiring students or trying to require people to change their visa status, etc., because that must have been administratively difficult to handle and so forth. So what kind of reasoning impelled you to go to this policy to charge tuition to non-immigrant aliens? I mean, what's the policy reason behind this?

A: I guess about the only thing I can answer that question is that the influx of Iranian students into the Atlanta Schools had become such a problem that we established procedures that we had really in the years before that never worried about because it just wasn't that many, but we—

Q: I'm not talking about the specific procedures. You say you always charged tuition.

A: Right.

Q: But why charge tuition is what I'm trying to get at, unless you were trying—you said there was an influx of Iranian students. Did you want to discourage those Iranian students from coming to the schools?

A: In essence, yes, that was probably *one of the main reasons*, because we were being used by Iranian students, who supposedly had already completed the education in Iran through the high schools, but they could not speak well enough English [sic] or good enough English [sic] to get into the colleges in Atlanta. So what they would do, they would come here, enroll in our high schools, get their year of English, so that they then could be proficient enough to pass the college entrance in language,

and basically that's the reason that we probably became much more aware of the problem with foreign students, and we checked on them a little bit probably closer than we had in the past and sent out information to the schools that, you know, this is the way it should be done.

Q: Then in effect, because you were having a problem with Iranian high school students who wanted to learn English in the Atlanta Schools, you became more concerned about enforcing the policy against elementary school students from every other country, not just Iran.

A: Well, it just really—the Iranian situation probably brought it to a head, and we just enforced the policy system-wide for all students.

Thompson Depo. at pp. 55–57 (emphasis supplied).

Based upon the foregoing statement of facts, the plaintiffs have moved for partial summary judgment that the procedure implemented in August of 1980 violated the plaintiffs' rights to equal protection under the United States Constitution, thereby exposing the defendants to liability under 42 USC § 1983. The defendants, responding to the motion, essentially argue that there are several factual issues. As noted above, there was no specific contravention of plaintiffs' statement of material facts. However, to the extent that the court could construe the brief in opposition to the motion for summary judgment as arguing that differing inferences could be drawn from the undisputed facts proved by the plaintiffs, the court will undertake to examine the defendants' position. First, the defendants argue that there is a disputed question of fact regarding whether the Board of Education ever "adopted" the practice of charging certain classes of non-immigrant aliens tuition. Second, the defendants argue that the procedure was a bona fide residency system, and therefore not violative of the equal protection clause. Third, defendants argue that there are disputed questions of fact with regard to whether the defendants intended to discriminate. Fourth, the defendants argue

that there was a compelling state interest, i.e., fiscal responsibility, for charging non-residents tuition, secondarily pointing out that it costs more to educate foreign students. Fifth, defendants argue that there are disputed inferences as to whether the individually named defendants meet the requirements for good faith immunity set out in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Finally, the defendants argue that the plaintiffs have not demonstrated compensable damages.

With regard to plaintiffs' equal protection claims, the defendants have made three arguments which go directly to the question of liability: whether the procedure is a bona fide residence requirement; whether the defendants intended to discriminate; and whether there was a compelling state interest served by this purportedly narrowly-tailored procedure. The court will discuss these three issues in context as it discusses the law in this area, and then will deal with defendants' remaining three arguments, all of which go to affirmative defenses.

It is beyond peradventure that the Pena's are entitled to the protections of the due process and equal protection clauses of the fourteenth amendment to the United States Constitution. *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976); *Sugarman v. Dougall*, 413 U.S. 634, 641, 93 S.Ct. 2842, 2847, 37 L.Ed.2d 853 (1973); *Graham v. Richardson*, 403 U.S. 365, 371, 91 S.Ct. 1848, 1851, 29 L.Ed.2d 534 (1971). When a state enacts classifications based upon alienage, the court is to examine the classification under the strict scrutiny standard. *Graham, supra*, at 372, 91 S.Ct. at 1852; *Sugarman, supra*, 413 U.S. at 642, 93 S.Ct. at 2847; *see also Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). In the words of the court in *Plyler*,

The Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike." ... [W]e have treated as presumptively invidious those

classifications that disadvantage a "suspect class," or impinge upon the exercise of a "fundamental right." With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest.

*Plyler*, 457 U.S. at 216–17, 102 S.Ct. at 2394 (citations omitted). Alienage classifications constitute a suspect classification. *Graham v. Richardson*, 403 U.S. at 372, 91 S.Ct. at 1852.

■ In addition to the equal protection standard explained above, requiring this court to apply strict scrutiny to the Atlanta Public School System's program in this case, the court also notes that this case implicates the federal government's strong interest in control over immigration policy. Any alienage classification which imposes a greater burden upon aliens than Congress intended is invalid, and cannot be asserted as a compelling state interest, or even as a rationale for the classification. *Mathews v. Diaz*, 426 U.S. at 84, 96 S.Ct. at 1893; *Toll v. Moreno*, 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982). As the Court noted in *Mathews*, the constitutional scheme of this country commits relations between the United States and aliens within its borders to the political branch of the federal government. 426 U.S. at 81, 96 S.Ct. at 1892. Therefore, it is beyond the authority of the states to attempt to regulate the conditions of entry and residence of aliens. *Id.* at 84, 96 S.Ct. at 1893.

As the city has correctly noted, however, the Supreme Court has upheld bona fide residence classifications which operate to disadvantage aliens. In *Martinez v. Bynum*, 461 U.S. 321, 103 S.Ct. 1838, 75 L.Ed.2d 879 (1983), the Court upheld a Texas law which required tuition for all children who were found within the school district, but who did not live with their parents or a guardian, if the reason they were present in the school district was solely to attend school. The Court held that bona fide residence requirements, "appro-

priately defined and *uniformly applied*" further a substantial state interest in insuring that its services are enjoyed only by residents. 103 S.Ct. at 1842 (emphasis supplied). However, as the Court noted in *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), such policies must be uniformly applied in order to be bona fide. In *Plyler*, the Court invalidated a Texas law which denied a free education to illegal aliens. The Court held that the distinction between illegal aliens, on the one hand, and legal aliens and United States citizens, on the other, did not constitute a bona fide residency requirement. Citing *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Court noted that although there is no constitutional right to a free public education, if the state chooses to provide one, it must do so on equal terms. *Plyler*, 457 U.S. at 222–23, 102 S.Ct. at 2397–98. This rationale was stated another way in *Mathews v. Diaz*, when the Court held as follows:

> Insofar as state welfare policy is concerned, there is little, if any, basis for treating persons who are citizens of another State differently from persons who are citizens of another country. Both groups are non-citizens as far as the State's interests in administering its welfare programs are concerned.

426 U.S. at 85, 96 S.Ct. at 1894.

■ Based upon the foregoing law, it is readily apparent to this court that the city of Atlanta's procedure implemented in August of 1980 violates the equal protection clause of the United States Constitution. Dealing first with the city's argument that the requirements are bona fide residency requirements, the court notes that they are not uniformly applied. The hypothetical presented to Mr. Thompson disposes of this argument readily. To be a bona fide residency requirement, according to *Martinez*, the plan must be uniformly applied. Under the city's policy, identically situated persons would be treated differently based on alienage. Specifically, a person who came from Birmingham, Alabama, to attend Georgia Tech for four years to earn an

advanced degree could demonstrate "residency" within the city and send his children to school tuition-free. Mr. Pena, a Venezuelan citizen, could come to the city to attend Georgia Tech for four years to get an advanced degree, and could not, under any circumstances, demonstrate "residency" within the city so that his children could attend school tuition-free. That is but one example of the lack of uniformity of this policy. Another is the distinction in treatment of an F visa-holder and a G visa-holder. The following hypothetical will demonstrate. Under the city's policy, two men from Venezuela, one who held an F visa and one who held a G visa, could come to Atlanta for exactly the same period of time. The F visa-holder, for example, might be intending to study at Georgia Tech for four years, while the G class visa-holder might be on a four-year rotation in the Venezuelan Consulate in Atlanta. Their living circumstances and "residence" situations are identical. However, the G class visa-holder's children will attend school tuition-free, while the F class visa-holder's children will have to pay tuition. No further discussion is required. The city's argument that this policy is a bona fide residence requirement is utterly without logic or merit.

That being the case, then the question becomes whether this form of classification based upon alienage survives strict scrutiny. It does not. The first question to be asked is whether there is an asserted compelling state interest behind this classification. One of the asserted interests in this case, that of Mr. Thompson's impression regarding the proper visa children of F–1 non-immigrant aliens should hold, clearly cannot be a compelling state interest, since that "interest" would violate the federal government's right to control the entrance and residence of aliens. If the federal government wanted to require an F–1 visa of all persons who would enter the country and will attend school while they are here, it could do so. It has chosen not to, and has provided that F–1 immigrants' spouses and minor children may enter the country on F–2 visas. It is hardly for the School Board of the City of Atlanta to second-guess that policy. Therefore, that does not provide a compelling state interest behind this procedure. Another of the reasons put forward behind this policy is the desire of the city of Atlanta to make its policy conform to that of other localities in the metropolitan Atlanta area. While uniformity might be a desirable goal, it can hardly be said to constitute a "compelling" state interest, particularly if the other localities are also violating the equal protection clause. A policy is no less unconstitutional merely because everyone does it.

With regard to the fiscal concerns put forward by Mr. Thompson, those concerns have the potential to be a compelling state interest. However, the equal protection clause also requires that the classification selected by the state be "precisely tailored" to serve the compelling state interest. The classifications adopted in this case are without rhyme or reason, much less precisely tailored. As noted above, the tax concerns expressed make no sense. An F class visa-holder is not exempt from payment of property taxes should he choose to buy property within the city limits, but must pay tuition, while a G class visa-holder, who is exempt from taxes if he chooses to buy property within the city limits, does not have to pay tuition. That is hardly precise tailoring. With regard to the assertion that it is more expensive to educate foreign students, again, it would be no more expensive to educate a F class visa-holder's child than it would be to educate a G class visa-holder's child, yet the two are treated differently. No rationale for the difference in treatment among visa classes has been brought forward by the city. The Supreme Court held in *Plyler* that if a free public education is offered by the state, it must be made available on equal terms to everyone. This city procedure carves out certain classifications of visas, which apparently are not related to any fiscal concern, and ignores several others, including illegal aliens. To the extent that the city's professed fiscal concerns could be construed to be a compelling state interest, the

court finds that as a matter of law this program is not narrowly tailored to serve those interests.

 The final rationale proffered for this program, that of discouraging Iranian high school students from attending school in this city, also rebuts one of the arguments raised by the defendants, which is that there is a question of fact as to whether they intended to discriminate. The testimony of Mr. Thompson, which this court reproduced verbatim above, demonstrates beyond any shadow of a doubt that "a main reason" behind this policy was to discourage one class of aliens from attending Atlanta Public Schools. That is obvious class-based animus. It was not that animus, directly, which hurt the plaintiffs. What hurt the plaintiffs was when the city decided not to tailor its program narrowly to its intention to discriminate against Iranians, but to "just enforce" the policy system-wide for all students. As long as invidious discrimination is a motivating factor behind the action taken by the city, an equal protection violation has been proven. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1976). The only fair reading of Mr. Thompson's testimony is that a motivating factor behind this program was to discriminate against aliens of Iranian citizenship, and, once having chosen to do that, the city decided to enforce its policy against all aliens. There is no question of fact here, as the defendants argue. Mr. Thompson's testimony is clear, and is unrebutted by anything else in the record. Indeed, it is an admission. Fed.R.Evid. 801(d)(2).

The court finds that the undisputed facts of this case show that plaintiffs have demonstrated that similarly situated individuals are treated in an unlike manner under the city's procedure. The city has not met its burden of demonstrating that a compelling state interest justifies the classification, or that the program is narrowly tailored to serve the compelling state interest. For that reason, unless the defendants can prove one of the affirmative defenses to liability in this action, plaintiffs' motion for summary judgment should be granted.

 The defendants have put forward two affirmative defenses: first, that the Board did not "adopt" this policy, and therefore the Board cannot be liable; and second, that there are questions of fact with regard to whether the individually-named defendants meet the requirements for good faith immunity. The former issue is readily disposed of. The only evidence of record on this point is that discussed by the court above. The finance committee of the School Board which, in the words of Mr. Thompson, is "in essence" the School Board itself, was informed of this program prior to its implementation, and voiced no opposition. Thompson's impression was that he had the verbal approval of the Board for the program, and he so stated in a letter sent out on School Board stationery to foreign student advisers at local universities. Section 1983 imposes liability on municipalities for injuries inflicted pursuant to government "policy or custom." *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). The defendants argue that there was no policy or custom in the present case, and that plaintiffs are attempting to assert liability on the part of the Board of Education of the City of Atlanta on the basis of *respondeat superior*. That is simply not the case. If nothing else, it was the Board's acquiescence that led Mr. Thompson to believe he had authority from the Board to promulgate this procedure, and led Mr. Crim to enforce it. This is not a case where liability would be imposed "merely because of an employment relationship." *See City of Oklahoma City v. Tuttle*, — U.S. —, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985).

In *Tuttle*, the Supreme Court noted that the "policy or custom" requirement was intended "to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decision-makers." In this case, the Board's agent, Mr. Thompson, developed a clearly unconstitutional policy, presented it to a

body which "in essence" was the Board itself, and came away with the impression he had authority to implement the program. A municipality should not be permitted to insulate itself from section 1983 liability merely by authorizing its agents to develop programs, being "informed" of them, and then silently acquiescing in their implementation. That would permit a municipality to enforce any number of unconstitutional policies, and circumvent section 1983 liability, merely by taking no action to supervise its employees. That was not the purpose of the statute. As noted in *Tuttle*, one way to establish a "policy," is via a "statement of the policy by the municipal corporation, and its exercise." 105 S.Ct. at 2436. Another way, however, to determine whether the policy is that of the municipality, is to ascertain whether it is created and executed "by its lawmakers *or by those whose edicts or acts may fairly be said to represent official policy....*" *Monell*, 436 U.S. at 694, 98 S.Ct. 2037. The "lawmakers" in this case are the School Board. Their action, or to be more precise, inaction, in the present case demonstrates that Mr. Thompson apparently has been conferred the authority to make official policy on behalf of the School Board. That being the case, under *Monell*, the School Board would be liable for Mr. Thompson's actions, not because he is an employee, but because his actions may fairly be said to represent official policy. For this reason, the court concludes that the defendants are incorrect in their assertion that the Board did not "adopt" the policy at issue.

■ The remaining point raised by the defendants as regards affirmative defenses is defendants' contention that there are factual questions regarding whether the individually named defendants are entitled to assert the defense of good faith immunity. Good faith immunity is an affirmative defense which must be pleaded and proved by the defendant official. *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736. The immunity standard set out in *Harlow* reads as follows:

[G]overnment officials performing discretionary functions ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.... Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time inaction occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.

*Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. The question, then, is whether the defendants have presented sufficient facts from which this court could infer that the defendants' conduct was undertaken in an objectively reasonable manner, and the conduct did not violate clearly established law of which the defendnts should have known.

■ In arguing the immunity issue, the defendants basically concede that the *Plyler* case from the Supreme Court, invalidating Texas' statute which imposed a tuition fee on illegal aliens, establishes that this program is unconstitutional. The question, they assert, is whether the individually named defendants could have been expected to know that at the time the program was enacted. The plaintiffs argue that Mr. Thompson did know, and the other individual defendants should have known, of the controlling Fifth Circuit precedents out of which the *Plyler* case came to the Supreme Court. In *Doe v. Plyler*, 628 F.2d 448 (5th Cir.1980), the Fifth Circuit held that distinctions among some, but not all, aliens violate the equal protection clause unless a compelling state interest is asserted. The holding is quite similar to that of the Su-

preme Court when it handled the *Doe* case some two years later. Plaintiffs additionally point to *Boe v. Wright*, 648 F.2d 432 (5th Cir.1981), which invalidated a similar program on the basis of the Fifth Circuit *Doe* decision. These precedents are from right around the time when this program was enacted, and were brought to the attention of the School Board directly in the form of a letter from plaintiffs' counsel in November of 1981. To the extent, then, that enforcement of this program continued after these judicial opinions were brought to the attention of the School Board, Mr. Crim, and Mr. Thompson, plaintiffs assert that the individual defendants should not be permitted to assert the defense of good faith immunity. Defendants' sole response to these two controlling precedents is that the Supreme Court had granted *certiorari* in those cases, such that the law was not "clearly settled." Of course, a grant of *certiorari* does not stay the mandate of the lower court decision unless the Supreme Court so directs, which it did not in these cases. Therefore, the *Boe* case and the *Doe* case were controlling precedents from within the circuit which should have informed the individual defendants that their program was unconstitutional.

Defendants Crim and Thompson had actual notice of these cases, and nonetheless refused to refund plaintiffs' tuition money, and continued to hold the plaintiff children's report cards. The clearly settled law in this circuit, of which the defendants were aware, should have put them on notice that their conduct was unconstitutional, at least as to defendants Crim and Thompson. The defendants' argument regarding questions of fact existing as to those defendants are without merit. With respect to the individual members of the School Board, who are sued both in their individual and in their official capacities, the record demonstrates that they were informed of the existence of these judicial precedents via a letter in June of 1982. This was well after the program was enacted and applied to the plaintiffs. However, after the letter was received, the Pena children's report cards were still withheld, and

Mr. Pena was not given a refund of the tuition. Indeed, to this day he has not been refunded the tuition he paid. The court concludes that as to the Board of Education members sued in their individual capacity, they, too, had notice of controlling precedent which made their conduct unconstitutional, and nonetheless continued to stay their course. No contradictory facts appear in the record. Fed.R.Civ.P. 56(e). Therefore, the court concludes that they also would not be entitled to assert the defense of qualified good faith immunity, except as to conduct which occurred before June 16, 1982. Similarly, defendant Crim may be able to assert good faith immunity for conduct which occurred before November 25, 1981. Defendant Thompson would have no good faith immunity at all, since he testified on deposition he was aware of the Fifth Circuit precedents in 1980. Thompson Depo. at 69. This was, of course, before these procedures were applied to the plaintiffs. Since the undisputed facts demonstrate knowledge on the part of the individual defendants as of the dates mentioned above, the immunity defense would be possible only to the extent enumerated above.

The court further holds, however, that notwithstanding the existence of the Fifth Circuit precedents and the later Supreme Court decision in the *Plyler* cases, these defendants should have been on notice in 1980 that this program was not constitutionally permissible. As noted above, the law has been settled for many, many years that aliens are entitled to both due process and equal protection under the fourteenth amendment. It has also been settled that a compelling state interest is required to support classifications based upon alienage, and those classifications will be analyzed under a strict scrutiny standard. In particular, the court is struck by the language cited above from the *Mathews* case, decided in 1976, in which it was held that states have no compelling interest in a welfare policy which makes distinctions between citizens of other states and aliens. 426 U.S. at 85, 96 S.Ct. at 1894. Nevertheless,

that is precisely what this policy does. The court concludes that the law was clearly settled at the time that this program was implemented, such that all the defendants should have known that it could not survive strict scrutiny under clearly settled precedent. Therefore, the individual defendants are not entitled to assert the benefit of the defense of qualified good faith immunity.

The final issue raised by the defendants is that the plaintiffs have not demonstrated compensable damages. The court disagrees. Constitutional rights are never valueless, and as noted above, the defendants' conduct has deprived the plaintiffs of the equal protection of the laws. The plaintiffs are therefore entitled to recover nominal damages, even if nothing else may be shown at trial. *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978). Moreover, defendants' argument regarding whether plaintiffs may recover the tuition extracted under a contract which plaintiffs claim to be illegal, merely points out that there are factual questions to be decided regarding whether Mr. Pena's "waiver" was knowing and voluntary, or, as plaintiffs assert, whether the contract was one of adhesion. There is no evidence in the record from which this court could determine that question either way.

In summary, plaintiffs' motion for partial summary judgment that their equal protection rights have been violated is GRANTED. Liability as to section 1983 is therefore determined in favor of plaintiffs and against defendants. With respect to plaintiffs' section 1985 claims, for conspiracy, there is no evidence whatsoever of record respecting whether there was a conspiracy or not. That being the case, plaintiffs are not entitled to summary judgment on the section 1985 claim. Therefore, plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART. The parties are DIRECTED to file with the court within thirty (30) days from the date of receipt of this order a proposed consolidated pretrial order which addresses the damage claims on the section 1983 issue,

the section 1985 issue in all respects, and the pending state law claims which were not addressed by the motion for summary judgment.